Robert KING and Raymond
Lambert, Appellants,

v.

Patricia KIDD, Appellee.

Nos. 90–CV–1621, 91–CV–283.

District of Columbia Court of Appeals.

Argued June 12, 1992.
Decided Aug. 26, 1993.
Rehearing en banc Denied April 27, 1994.

Susan S. McDonald, Asst. Corp. Counsel at the time the brief was filed, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellants.

Christopher W. Hornig, with whom Vicki G. Golden and Eric Steele, were on the brief, for appellee.

Before FERREN and KING, Associate Judges, and GALLAGHER, Senior Judge.

FERREN, Associate Judge:

This case presents the question whether a jury reasonably could find that actions by two government agency supervisors, Robert King and Raymond Lambert, amounted to "extreme and outrageous conduct," justifying liability for intentional infliction of emotional distress on an agency employee, Patricia Kidd, who was sexually harassed by another employee, Melvin Carter, while working with Kidd under King's and Lambert's supervision. Plaintiff-appellee Kidd sued defendant-appellants King and Lambert, as well as employee Carter and the District of Columbia, for sexual harassment (statutory claim) and for intentional infliction of emotional distress (tort claim) arising out of Kidd's employment with the District of Columbia Department of Administrative Services (DAS).[1] After the trial court directed a verdict in favor of Lambert and the District on the sexual harassment claim, a jury found Carter liable under both the sexual harassment and the emotional distress claims, found appellants Lambert and King liable under the emotional distress claim, and found in favor of the District on the emotional distress

---

1. Appellee's original complaint for damages alleged that the defendants, government employees acting under color of "state" law, had violated her rights under the equal protection clause of the United States Constitution entitling her to damages under 42 U.S.C. § 1983 (1988). The Superior Court in effect allowed appellee to amend her complaint to state a proper claim for relief based on Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e (1988), giving her a sex discrimination cause of action for damages under § 1983. Additionally, the trial court directed a verdict in favor of the District and appellants Lambert and King on appellee's claim that they had negligently failed to train and supervise Carter.

claim, and found in favor of King on the sexual harassment claim. The jury awarded Kidd $258,000 in compensatory damages, jointly and severally, against King and Lambert and co-defendant Carter. In addition, the jury awarded Kidd punitive damages in the sum of $30,000 against Carter, $10,000 against King, and $2,000 against Lambert. The only verdicts on appeal are those against King and Lambert on the tort claim of intentional infliction of emotional distress.[2]

Appellants argue that: (1) the Superior Court did not have subject matter jurisdiction over Kidd's emotional distress tort claim because such an action is preempted by the Comprehensive Merit Personnel Act (CMPA); (2) as a matter of law, the actions of King and Lambert, respectively, did not constitute "extreme and outrageous" conduct necessary to hold them liable for intentional infliction of emotional distress; and (3) King and Lambert were held vicariously liable for Carter's actions, contrary to law, under the doctrine of respondeat superior.[3] In turn, Kidd contends that appellants are barred from raising: (1) the jurisdictional argument, because appellants failed to raise it in the trial court; (2) the sufficiency of the evidence argument, because appellants failed to raise it in a motion for directed verdict at the close of all the evidence; and (3) the respondeat superior argument, because appellants "consented to all jury instructions." Although we reach all three of appellants' arguments, we only agree with one: the evidence was insufficient as a matter of law to hold appellant Lambert liable for intentional infliction of emotional distress. We affirm in all other respects.

## I. Statement of Facts

The jury considered the following evidence at the joint trial of appellants, Robert King and Raymond Lambert, and their co-defendant, Melvin Carter.

### A. Background Concerning Co–Defendant Carter

In June 1987, Patricia Kidd began working for DAS as a DS–7 space management specialist. Kidd testified that approximately four weeks after she had begun work, Melvin Carter, her immediate supervisor, began making sexual comments to her. He told her that a lot of men were asking questions about her, that she could have her "pick," and that he was "interested" as well. She rebuffed him. Shortly thereafter Carter explained to Kidd how women "fucked their way to the top, that he had no problem with it." Thereafter, Carter began telling Kidd that he "had a lot of clout," he knew people throughout the District government, and he could make things "easy" for her. He began demanding that she run errands for him and told her how he controlled other female employees in the office through sex. He began calling her at home and once asked her when she would make love to him. When she informed him she had a boyfriend, he said "it didn't mean a motherfucking thing" and that he "wanted" her.

Around December 1987, Carter showed Kidd documents demonstrating that she was a probationary employee. He told her that, because of her probationary status, she could be fired at his recommendation and that no one would question anything. Kidd also testified that Carter had been creating difficulties for her at work by causing "friction," forbidding her to use a computer, and denying her access to clerical help. In December 1987, Carter telephoned Kidd at her work desk and ordered her to come to a nearby hotel. When she hung up, he called back and reminded her of her probationary status. She went to the hotel, and they had sex. Kidd's employment situation improved for a while but then Carter resumed pursuing her. When she rebuffed him, he began mistreating her again. When she attempted to apply for a position in another office, Carter came

2. Carter filed a separate appeal. The trial court also awarded appellee $97,839 in attorney's fees and, in separate orders, $3,848.15 and $563.79 in costs and expenses.

3. In their brief, appellants also challenged the trial court's order directing the District of Co-

lumbia to promote Kidd retroactively to the position she would have held but for the actions of the defendants. As recognized by appellants' counsel at oral argument, however, such a claim must be brought by the District itself, which is not a party to this appeal.

to her and told her that she would not get it, but that if she had sex with him again she would get a promotion. When she refused he became angry and loud, took away her computer and her clerical assistant, and told people to stay away from her.

In February 1988, Kidd complied with Carter's renewed request and had sex with Carter again. According to Kidd's testimony, Carter also forcibly sodomized her, rupturing her anal tissues and causing her to fear AIDS. Shortly thereafter, he arranged for her to get a promotion to a DS–9–11–12 position, starting as a DS–9, and told her she could get a promotion every year if she "acted right."

Kidd testified that Carter's continual harassment rendered her dysfunctional in her home life; she became hostile or distant to her children and felt humiliated and out of control. Kidd said that she believed Carter effectively had absolute power over her in her probationary year and that if she resisted him, she would be sacrificing her whole career.

After the February incident, Kidd refused to have sex with Carter again. At that point, however, Carter became "out of control" and "obsessed with sex." Because she would not go along with his wishes, Carter kept Kidd's work from her so that she was forced to "sneak in" to accomplish it, and he prohibited a computer analyst from working with her on her program. On May 18, 1988, Carter demanded sex but Kidd refused. Carter then summoned Kidd to his office, verbally admonished her, and gave her a letter of reprimand. In response, she called the personnel office, submitted a letter of complaint and then filed an "informal grievance." When Carter failed to respond satisfactorily, on May 19, 1988, Kidd filed a formal grievance with Carter's supervisor, appellant King. Neither the informal nor the formal grievance explicitly mentioned sexual misconduct, although the formal grievance complained of months of "stress, harassment and mistreatment" and stated that "supervisors should not be allowed to use their title to constrict, harness and abuse subordinate employees' rights and human rights." Kidd also advised

King that she feared reprisals or retaliatory actions and that she felt "trapped."

Immediately after Kidd filed the grievance with King, Carter permanently took away her clerical assistant and put that clerical assistant in supervisory control over Kidd. Furthermore, he took Kidd off a computer program she had developed to manage the District's real property, excluded her from program meetings, and stopped giving her work. He also refused to let her serve on a women's committee for which she had been nominated. Kidd related all this to King in a supplementary grievance.

### B. Involvement of Appellants King and Lambert

On July 21, 1988, Kidd received a letter of response from King rejecting her grievance in its entirety. The letter related that King had met with Carter, that Carter had tried to resolve office problems, and that Kidd had a negative attitude and wasn't a team member. The letter stated: "Mr. Carter has demonstrated to me that he is a fair and honest person who is very reliable and dependable and shows an exceptional cooperation and teamwork spirit."

Kidd next submitted a handwritten grievance to appellant Lambert, Director of DAS. Although Lambert did not recall ever seeing the grievance, Kidd testified that she submitted it to Sylvia Brown, Lambert's correspondence secretary, and that the document bore the signature of Ms. Brown. This grievance complained of oppressive treatment with reference to sexual harassment. She accused King of failing to protect against reprisals and to investigate allegations equitably, of granting an audience to Carter and not to her, and of displaying bias. She argued that King was concerned about protecting Carter's character and integrity, but not hers, and that he had not met his obligation to give her grievance full, impartial, and prompt consideration. Kidd also stated that she "would consider remaining in the position providing I receive your word in writing that I receive equitable treatment along with other male employees. That I not be harassed."

When Kidd returned from a two week sick leave, after filing her grievance with Lam-

bert, she discovered that Carter had arranged for her to be transferred immediately to a different division in DAS under the supervision of Linton Cheers. Kidd testified that she acquiesced in the transfer because she felt she had no other choice. On September 1, 1988, Kidd filed with the Office of Human Rights (OHR) a sexual harassment complaint which, for the first time, explicitly charged that Carter had coerced her to have sex with him.

At some point in September or October of 1988, King summoned Kidd to a meeting. According to Kidd, King had learned of her OHR complaint against Carter and told her that Carter wanted her to sign a statement that her transfer was voluntary. King said this would help Carter with the OHR complaint. Kidd refused.

Kidd's testimony was corroborated by Linton Cheers, her new supervisor. Cheers testified that Kidd's transfer was supposed to be a "reassignment," which gives an employee full credit for time in grade towards a promotion, in contrast with a "detail," which is a temporary transfer that does not give credit for time in grade. Cheers said that he had attended two meetings with King and Carter in which they refused to effect the reassignment. Although King called the meetings, he allowed Carter to run them. According to Cheers, during these meetings Carter made clear that he was "angry and bitter" and that he refused to do anything for Kidd because of her OHR complaint. Kidd was subsequently assigned to another "detail." Several months later, according to Kidd, King denied Kidd her promotion because of her "detail" status, which, he added, had been her choice.

## II. Subject Matter Jurisdiction and Preemption

Appellants, relying on *District of Columbia v. Thompson*, 593 A.2d 621, 625–27 (D.C.) (*Thompson II* ), *aff'g in part and vacating in part* 570 A.2d 277 (D.C.1990) (*Thompson I* ), *cert. denied,* —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991), argue that the Superior Court did not have subject matter jurisdiction over Kidd's claim for intentional infliction of emotional distress because the Dis-

trict of Columbia Government Comprehensive Merit Personnel Act (CMPA) preempts appellee's tort claim. *See* D.C.Code §§ 1–615.1 to –615.5 (CMPA Subchapter 15, "Performance Evaluation") and §§ 1–617.1 to –617.3 (CMPA Subchapter 17, "Adverse Actions") (1992 Repl.). They accordingly contend that Kidd's sole recourse—for the emotional distress tort component of her litigation, in contrast to the statutory sexual harassment component—was an administrative remedy under the CMPA. Kidd counters that a claim based on, or intertwined with, sexual harassment allegations is not covered under the CMPA; therefore, CMPA does not preempt her tort claim. Kidd also contends that appellants' jurisdictional argument is not properly before this court because appellants failed to raise it in the trial court.

### A. Principles of Subject Matter Jurisdiction

■ Before analyzing the parties' arguments, we first review a few basic principles regarding subject matter jurisdiction. The Superior Court is "a court of general jurisdiction with the power to adjudicate any civil action at law or in equity involving local law." *Andrade v. Jackson,* 401 A.2d 990, 992 (D.C. 1979). Unless the legislature has divested the Superior Court of jurisdiction of a particular subject matter through enactment of legislation, the court has general jurisdiction under D.C.Code § 11–921 (1989) over common law claims for relief. In a somewhat different context this court has said: "[W]here [a] claim has a rational nexus to a subject matter within the responsibility of a division of the Superior Court, that division may rely upon its general powers in accepting jurisdiction over the claim." *Farmer v. Farmer,* 526 A.2d 1365, 1369 (D.C.1987); *see Poe v. Noble,* 525 A.2d 190, 195 (D.C.1987).

■ Whether the Superior Court accepts jurisdiction over a claim is primarily a threshold matter, determined when the parties file their pleadings and pre-trial motions. Under our rules of civil procedure, a pleading which sets forth a claim for relief must contain "a short and plain statement of the grounds upon which the Court's jurisdiction depends." Super.Ct.Civ.R. 8(a)(1). In turn,

the opposing party may raise the defense of lack of subject matter jurisdiction by pleading or motion, *id.* at R. 12(b)(1), although the Superior Court must dismiss the complaint at any point if it becomes apparent that it lacks subject matter jurisdiction, *id.* at R. 12(h)(3). In this case appellee Kidd alleged jurisdiction under D.C.Code § 11–921, and there is nothing in the record to indicate appellants objected to that assertion.

 The District of Columbia adheres to the traditional rule that a party's acquiescence in the trial court's exercise of subject matter jurisdiction (or a waiver of a defense of lack of subject matter jurisdiction), indicated by the failure to raise the defense before or during trial, does not preclude that party from raising the issue on appeal.[4] *See Clay v. Faison,* 583 A.2d 1388, 1390 n. 2 (D.C.1990); *Farmer,* 526 A.2d at 1368 n. 3; *In re An Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Inst., Dep't of Human Resources,* 430 A.2d 1087, 1100 (D.C. 1981) (Ferren, J., dissenting) (noting that majority properly addressed subject matter jurisdiction argument of appellant even though appellant failed to raise argument in trial court); *see also In re Plummer,* 608

A.2d 741, 748 n. 3 (D.C.1992) (Rogers, C.J., concurring) (citing *Clay* and *In re An Inquiry*); *id.* at 751 (Schwelb, J., concurring) (discussing same). Under the traditional rule, " 'neither silence nor consent of the parties can confer jurisdiction.' " *McCray v. McGee,* 504 A.2d 1128, 1131 (D.C.1986) (quoting *1425 F Street Corp. v. Jardin,* 53 A.2d 278, 279 (D.C.1947)).[5] Furthermore, as this court said long ago, "[i]t is our duty to notice a lack of jurisdiction even though the parties may desire a decision on the merits." *Yeager v. District of Columbia,* 33 A.2d 629, 630 (D.C. 1943).[6]

If we were to conclude that the Superior Court did not have jurisdiction to hear this case, then this court would be without jurisdiction on appeal. *Council of School Officers v. Vaughn,* 553 A.2d 1222, 1228 (D.C.1989). In such an event, our only choice would be to "remand the case to the trial court with instructions to vacate its judgment as void and to dismiss the complaint for want of jurisdiction." *Id.*

### B. CMPA Preemption of Appellee's Tort Claim

"Subject matter jurisdiction concerns the court's authority to adjudicate the type of

---

**4.** The traditional rule is stated in 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1393, at 766–73 (1990):

[A] question of subject matter jurisdiction may be presented by any interested party at any time.... [even] for the first time on appeal.... If ... jurisdiction is not apparent, the Court not only will, but must, refuse to proceed with the determination of the merits of the controversy, unless this failure can be cured. This is true regardless of what stage the case may be in, and whether the defect is called to the Court's attention by suggestion of the parties or otherwise....

(Footnotes and internal quotation marks omitted).

One authority has suggested that, in light of historical shifts in the relative importance of jurisdiction and finality, "[i]t may well be that procedural rules of the future will be reformulated to require that objections to subject matter jurisdiction be raised before trial on the merits, thus expressing a policy approaching that now applied to objections to territorial jurisdiction." Restatement (Second) of Judgments § 11 cmt. d (1982). However, the Restatement does not explicitly adopt such a rule, because "the question of time limitations within which a challenge to competency may be made is one of procedure and beyond the scope of this Restatement." *Id.*

Although § 12 of the Restatement presents a rule, with three exceptions, that "[w]hen a court has rendered judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation," the context reveals that the term "subsequent litigation" refers to collateral attacks in other suits, not to direct appeals. *See id.* § 11 cmt. d, § 12 cmts. a-f. In any event, as the cases cited above make clear, our own rule is that subject matter jurisdiction may be raised even for the first time on appeal.

**5.** This rule also applies in criminal cases. *See Arrington v. United States,* 585 A.2d 1342, 1344 n. 2 (D.C.1991); *Adair v. United States,* 391 A.2d 288, 290 (D.C.1978).

**6.** Appellee Kidd argues that appellants deliberately or strategically waived any jurisdictional argument by failing to raise the issue in the trial court. Because appellants' counsel, Corporation Counsel, also represented the District of Columbia in *Thompson,* we agree with Kidd that it appears appellants intentionally failed to raise the subject matter jurisdiction defense at trial. Nonetheless, under the traditional rule that we must follow, the reason why the Corporation Counsel failed to raise the argument below is irrelevant to our analysis.

controversy presented by the case under consideration." *Appeal of A.H.*, 590 A.2d 123, 128 (D.C.1991). The specific jurisdictional issue in this case is whether CMPA Subchapters 15 and 17 preempt Superior Court subject matter jurisdiction over Kidd's common law emotional distress claim. In *Thompson II* we noted, after reviewing the purpose and text of the CMPA, that the Council of the District of Columbia intended the Act to "address[ ] virtually every conceivable *personnel issue* among the District, its employees, and their unions—with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum." 593 A.2d at 634 (emphasis added). We therefore concluded that, even though Subchapters 15 and 17 of the Act do not include an exclusivity provision,[7] "the Council intended CMPA to provide District employees with their exclusive remedies for claims arising out of employer conduct in handling personnel ratings, employee grievances, and adverse actions." *Id.* at 635.

■ We did not hold, however, that the CMPA preempts tort claims in general or all claims of intentional infliction of emotional distress in particular. Rather, the CMPA implicitly preempts a common law action only if the employee claims wrongful treatment and injury cognizable as a "personnel issue" under the Act's "performance ratings," "adverse actions," and employee "grievances" provisions. *Id.; see* D.C.Code §§ 1–615.1 to –615.5 and §§ 1–617.1 to –617.3; *cf. Newman v. District of Columbia*, 518 A.2d 698, 705–06 (D.C.1986) (intentional infliction of emotional distress claim grounded on alleged discrimination based on sexual orientation not preempted by exclusivity provision of CMPA disability compensation subchapter).

For example, the employee-plaintiff in *Thompson* sued for intentional infliction of emotional distress based on the following acts of her supervisor:

> [her supervisor] approved her leave and then changed her status to absence without leave; he refused to consider her for promotion to the next grade level or to give her the computer test she asked for; he isolated her from the other employees; he requested statements from her doctor as to her limited hours; he wrote memoranda on her excessive leave; and he assaulted her and lied about it, resulting in her job loss.

*Thompson II*, 593 A.2d at 625 (quoting *Thompson I*, 570 A.2d at 290). After outlining and discussing Subchapters 15 and 17, *see id.* at 625–27, we concluded that the CMPA preempted Thompson's tort claim for intentional infliction of emotional distress because the above actions by her supervisor constituted personnel evaluation decisions and disciplinary actions fitting squarely within the text and purpose of the CMPA's administrative review and grievance procedures. *See id.* at 635.[8] In contrast, Thompson's claim for assault and battery was not covered by CMPA Subchapters 15 and 17 and therefore was not preempted by the Act. *See id.* at 624 n. 2, 635.

■ In this case, Kidd's claim for intentional infliction of emotional distress was premised on, and fundamentally related to, her allegations (supported by evidence adduced at trial) of sexual harassment and retaliation. Appellants acknowledge that claims of sex discrimination (including sexual harassment) are not addressable as "personnel issues" under CMPA Subchapters 15 and 17. They argue, however, that Kidd's tort claim against King and Lambert was really nothing more than a complaint about the classification of her August 1988 transfer and the failure of King and Lambert to respond properly to her grievances. Appellants' characterization of Kidd's claims trivializes her testimony at trial (which the jury believed, as indicated by its award of punitive damages against all three individual defendants) and ignores the link between the actions of Carter and appellants. Carter's actions constituted quid pro quo sexual harassment and were not grievable under the

---

7. *Compare* D.C.Code § 1–624.16(c) (exclusivity provision for CMPA Subchapter 24, "Disability Compensation").

8. In addition, we held that Thompson's tort claim of defamation also fell within the scope of the CMPA. *Thompson II*, 593 A.2d at 635.

CMPA.[9] Kidd's allegations against King and Lambert were directly related to her complaints about Carter's discriminatory behavior. For example, at trial Kidd testified, and produced other supporting evidence, that King colluded with Carter in responding to her grievance against Carter (which included allegations that Carter had abused his position of authority in violation of Kidd's human rights), and that King participated in retaliating against Kidd—after she had filed a formal sexual harassment complaint with the Office of Human Rights—by changing Kidd's job "reassignment" to a "detail."

In fact, appellants' argument that the CMPA preempted Kidd's tort claim is no more than another way of saying they do not believe the sexual harassment and retaliation foundation of Kidd's emotional distress claim. That, however, is an argument about the sufficiency of the evidence, *see infra* Part III., not about subject matter jurisdiction.

After reviewing the purposes and text of the CMPA, *see Thompson II*, 593 A.2d at 625–27, we find no basis to conclude that CMPA's remedial system preempts Kidd's tort claim of intentional infliction of emotional distress based on acts of sexual harassment and subsequent retaliation. We note that the District of Columbia Personnel Regulation on "Adverse Actions and Grievances" expressly excludes from employee grievance procedures "[a]n allegation of unlawful discrimination, or any other matter within the jurisdiction of the D.C. Office of Human Rights." D.C. Personnel Regulations § 1632.1(o), 34 D.C.Reg. 1845, 1878 (1987). Although the jurisdictional issue appellants raise concerns Kidd's common law claim and not her related Title VII sex discrimination claim, we think the exclusion of sexual harassment claims from CMPA Subchapters 15 and 17 is persuasive evidence that appellee's tort claim—fundamentally linked to her sexual harassment claim—is not cognizable as a "personnel issue" under the Act's "performance ratings," "adverse actions," and employee "grievances" provisions. *See* D.C.Code §§ 1–615.1 to –615.5 and §§ 1–617.1 to –617.3. Kidd's claim for intentional infliction of emotional distress had an inherent "nexus" to her sexual harassment claim, "a subject matter within the responsibility of a division of the Superior Court," and it was therefore proper for the court to "rely upon its general powers in accepting jurisdiction over the claim." *Farmer*, 526 A.2d at 1369.

■ "[P]ublic employees do not lose their common law rights to sue for the[ir] injuries ... [when] neither those injuries nor their consequences trigger" the exclusive provisions of the CMPA. *Newman*, 518 A.2d at 705. Because there is no evidence that the Council of the District of Columbia intended to divest the Superior Court of its preexisting jurisdiction to hear intentional infliction of emotional distress claims arising out of allegations of government workplace sexual harassment and subsequent retaliation,[10] we hold that the Superior Court had jurisdiction to hear both Kidd's sexual harassment claim and her interrelated or "pendent" tort claim.[11] *Cf. Capitol Hill Hosp. v. District of Columbia State Health Planning & Dev. Agency*, 600 A.2d 793, 799 (D.C.1991) (court has subject matter jurisdiction if case is one the sovereign has empowered it to entertain); *District of Columbia Employees' Comp. Appeals Bd. v. Henry*, 516 A.2d 941, 944 (D.C. 1986) (Superior Court lacked subject matter jurisdiction to hear appeal from decision of Secretary of Labor because "contrary result would impermissibly defy the intent of Con-

9. District employees complaining of discrimination must file their claims pursuant to procedures established under a different statutory scheme, the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 to –2557 (1992 Rep. & 1993 Supp.). *See Williams v. District of Columbia*, 467 A.2d 140, 142 (D.C.1983). That is what Kidd did in this case when she filed her formal sex discrimination complaint with the Office of Human Rights on September 1, 1988.

10. Our holding in this case says nothing about exhaustion of administrative remedy requirements under the Human Rights Act.

11. Although not entirely congruent, it is useful to analogize appellee's common law claim accompanying her sex discrimination claim as "pendent," similar to a state law claim that might be pendent to a federal claim if "derive[d] from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

gress"). Accordingly, we now turn to appellants' substantive argument.

### III. Sufficiency of the Evidence

Appellants argue that, as a matter of law, the evidence failed to show that either of them acted in a manner that was "extreme and outrageous" enough to expose them to liability for intentional infliction of emotional distress. They also contend that they were improperly held vicariously liable for Carter's conduct under a theory of respondeat superior. Kidd responds that appellants waived these arguments on appeal because appellants failed to preserve them in a motion for directed verdict at the close of all the evidence. Below, in Part A. we address Kidd's threshold waiver argument, in Part B. we address appellants' contention regarding vicarious liability, and in Part C. we address the sufficiency of the evidence issue.

### A. Appellants' Alleged Failure to Move for Directed Verdict

■ Appellants moved for a judgment notwithstanding the verdict (j.n.o.v.), contending, among other things, that "defendants Lambert and King did not, as a matter of law, intentionally inflict emotional distress upon the plaintiff." Kidd opposed the motion, arguing, among other things, that appellants were precluded from moving for a j.n.o.v. because they had not moved for a directed verdict at the close of all evidence as required under Super.Ct.Civ.R. 50(b). *See Howard Univ. v. Best,* 547 A.2d 144, 147 (D.C.1988) (*Best II*); *District of Columbia v. Hickey,* 150 A.2d 463, 466 (D.C.1959). In its order denying appellants' motion, the trial court agreed with Kidd's preclusion argument in a footnote but nonetheless reached the merits of the motion.

Our review of the transcript reveals that appellants did not make a precise motion for directed verdict at the close of the evidence. Nonetheless, we think appellants' counsel adequately preserved the issue of evidentiary sufficiency for appeal. During the court's colloquy with counsel, just before court and counsel finalized the jury instructions, defense counsel stated:

I am sorry Your Honor, I have one question about the intentional infliction of emotional distress. Under [*Howard Univ. v. Best,* 484 A.2d 958, 985 (1984) ] ... it says, "It is for the trial court to determine[,] in the first instance[,] whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." ... It seems to me the Court would have to make a finding—

At that point the court interrupted, saying:

I think the Court by submitting this to the jury has ruled, but if you would like me to rule, I would say as follows: If the plaintiff's story is to be believed, and I think the Court must make that finding based on the plaintiff's story, whether it was contradicted or not, it is clearly outrageous enough that you will find that the Court is also sending punitives to the jury as to Mr. Carter.

A few moments later, defense counsel asked for clarification:

[Counsel]: Has the Court determined that the conduct of Mr. Lambert and Mr. King was sufficiently outrageous as to become a question for the jury?

[Court]: No, no, but we are dealing with respondeat superior.

Whatever the merits of the trial court's ruling, *see infra* Part III.B., we conclude that defense counsel in effect made a motion for directed verdict on the intentional infliction of emotional distress claim with respect to both King and Lambert. Defense counsel cited *Howard Univ. v. Best,* 484 A.2d 958, 985 (D.C.1984) (*Best I*), which holds that the trial judge should decide first whether the plaintiff has made out a prima facie case before sending the case to the jury. *See also Waldon v. Covington,* 415 A.2d 1070, 1078 (D.C.1980) (before sending case to jury, court must first determine whether plaintiff's evidence is minimally sufficient to meet elements of intentional infliction of emotional distress tort); RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965) (same). The *Best I* opinion goes on to declare that "[t]he case should be submitted to the jury if reasonable people could differ on whether the conduct is extreme and outrageous" [one of the requirements for making out a prima facie case].

484 A.2d at 985. The obvious implication is that, if reasonable persons could only conclude that the defendant's conduct was not "extreme and outrageous," the trial court must direct a verdict in the defendant's favor.

In *Best II* we stated: "The failure to move for directed verdict precludes a party from questioning on appeal the sufficiency of the evidence." 547 A.2d at 147 (internal quotation marks omitted). We also observed, however, that there is a purpose behind that rule, as embodied within Super.Ct.Civ.R. 50(b). Primarily, it "preserve[s] the sufficiency of the evidence as a question of law" allowing the trial court, in considering a subsequent motion for j.n.o.v., to review "its decision not to direct a verdict rather than [to] engag[e] in a reexamination of the facts found by the jury." *Best II*, 547 A.2d at 148. In the present case, we think that defense counsel's citation to *Best I* and questions to the court fulfilled the preservation purpose of a timely motion for directed verdict. "In moving for a directed verdict, technical precision is not required." *Id.* (internal quotation marks omitted). Therefore, we conclude that appellants are not precluded from raising their sufficiency of the evidence arguments on appeal.

### B. Respondeat Superior Theory of Liability

█ Appellants contend that the jury found them vicariously liable under a theory of respondeat superior, which by law could only apply to the District as the employer of the tortfeasor (Carter) and not to appellants as supervisory employees.[12] It is not clear from the transcript whether the trial court intended to send to the jury the tort claim against King and Lambert on both direct liability and vicarious liability (respondeat superior) theories. It does appear, however, that at one point the court said Kidd had made out a prima facie case against King and Lambert "under good old-fashioned respondeat superior." We agree with appellants— and Kidd conceded during oral argument— that as a matter of law only the employer, the District of Columbia, could be held liable

for the tortious acts of one of its employees (Carter) against another (Kidd). *See, e.g., Robertson v. Sichel,* 127 U.S. 507, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) (government supervisory employee cannot be held vicariously liable for acts of subordinates; plaintiff must prove supervisor was personally negligent in discharge of his or her own duties); *Best I,* 484 A.2d at 987; *Eskridge v. Jackson,* 401 A.2d 986, 989 (D.C.1979); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS §§ 69–70 (5th ed. 1984); STANDARD-IZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA NO. 6–1 (rev. ed. 1981) ("Vicarious Liability—Basis"); *cf. Hunter v. Countryside Ass'n for the Handicapped, Inc.,* 710 F.Supp. 233, 239 (N.D.Ill.1989) (where plaintiff asserted Title VII claim as well as tort claims of assault, battery, and intentional infliction of emotional distress, court dismissed tort claims against employer because plaintiff failed to show tortfeasor's acts were committed in furtherance of employment).

However, our reading of the jury instructions, verdict form, and the evidence presented at trial compels us to conclude that the jury in fact considered each individual appellant's direct liability for his own allegedly tortious acts.

█ The trial court first instructed the jury on the elements of intentional infliction of emotional distress "across the board with all the four defendants" (Carter, King, Lambert, and the District). After instructing the jury on the elements of the sexual harassment claim under Title VII, the trial court stated that King could be held liable on the Title VII claim only if Kidd had proved the "additional element" of "respondeat superior," meaning "that Mr. King knew or should have known of the harassment in question and failed to take prompt remedial action." Despite the trial court's misuse of the term "respondeat superior," its statement of the standard of liability—"that King knew or should have known of the harassment in question and failed to take prompt remedial action"—indicates the court was applying a standard of direct liability attributable to

---

12. The District did not attempt to raise any immunity defenses.

King's own actions or inactions, not a standard of vicarious liability. Furthermore, the court read no respondeat superior charge after instructing the jury on the elements of Kidd's intentional infliction of emotional distress claim against King. It was only later, after finishing its Title VII instructions, that the court read a general instruction on respondeat superior:

> An employer is responsible for the acts or omissions of an employee which were committed while the employee was furthering the employer's business. I use the term "furthering the employer's business." This term does not mean that the employer is responsible merely because ... the accident occurred during working hours, or merely because the accident occurred ... on the employer's premises or while the employer was using the employer's equipment. Rather it means the employee must be serving or furthering a business interest of the employer. The question is whether the employee at the time of the incident had any business-connected reason for the conduct at issue.

> In this case it is admitted that the employee was engaged upon the business of the employer at the time of the incident. Therefore the employer is responsible for any acts or omissions of the employee, although the employer is entitled to the benefit of any defense which is available to the employee.

■ Without critiquing the specifics of that instruction, we find it correctly stated that only the "employer," *i.e.*, the District of Columbia, could be held vicariously liable for its employees' acts. Although the court did not clarify for the jury who the "employer" was, as Kidd points out, appellants did not

object to the instructions as given, nor did they offer any acceptable alternative. Furthermore, the jury verdict form appellants agreed to did not request the jurors to indicate a particular theory under which they held each individual appellant liable. "[A] defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on [an erroneous theory] when there was sufficient evidence to support another theory properly before the jury." *Nimetz v. Cappadona*, 596 A.2d 603, 608 (D.C. 1991). Finally, our review of the evidence at trial demonstrates that Kidd presented evidence advancing a theory of direct liability for both King and Lambert.

Given all of the above circumstances, we conclude that, despite some confusion between trial counsel and the trial court over the doctrine of respondeat superior,[13] the jury was clearly instructed to consider evidence of appellants' direct liability. We reject appellants' contention that the jury found them liable under a mistaken theory of respondeat superior.

## C. "Extreme and Outrageous Conduct"

■ In reviewing the trial court's decision to submit Kidd's intentional infliction of emotional distress claim to the jury, we must view the evidence in the light most favorable to Kidd, giving her "the benefit of every rational inference therefrom." *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 38 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982). To succeed on her claim, Kidd had to show that appellants engaged in (1) "extreme and outrageous conduct" which (2) "intentionally or recklessly"

---

**13.** This confusion may be explained in part by a misleading statement in *Eskridge v. Jackson*, which reads: "It is generally recognized, however, that the doctrine of respondeat superior has no application as between a public officer and his subordinates, unless the officer directs or countenances the tortious act." 401 A.2d at 989; *accord Jackson v. District of Columbia*, 412 A.2d 948, 957 n. 21 (D.C.1980). Of course, if a supervisory "public officer" "directs or countenances the tortious act" of a subordinate, then that officer is subject to direct, rather than vicarious, liability for his or her own actions (assuming no privilege or immunity). *See Robertson v. Sichel*,

127 U.S. at 515, 8 S.Ct. at 1290. As the RESTATEMENT (SECOND) OF AGENCY § 219 (1958) clarifies, a "master" or principal is vicariously liable only "for the torts of his [or her] servants committed while acting *in the scope* of their employment," *id.* at § 219(1) (emphasis added), and is not liable "for the torts of his [or her] servants acting *outside the scope* of their employment, unless" the master "intended the conduct or the consequences," the master was "negligent or reckless," the servant's conduct "violated a non-delegable duty of the master," or the servant acted under apparent authority on behalf of the principal, *id.* at § 219(2) (emphasis added).

(3) caused Kidd "severe emotional distress." *Best I*, 484 A.2d at 985 (quoting *Sere*, 443 A.2d at 37); *see* RESTATEMENT (SECOND) OF TORTS § 46. Appellants argue that "as a matter of law, King's and Lambert's conduct could [not] be found by the jury to constitute the 'extreme' or 'outrageous' conduct required to make a party liable for intentional infliction of emotional distress." Thus, appellants only challenge the sufficiency of the evidence going to the first element of the tort, "extreme and outrageous conduct," and do not challenge the evidence with respect to the second and third elements.[14] "[I]f reasonable people could differ on whether the conduct [was] extreme and outrageous," the trial court properly submitted the issue to the jury. *Best I*, 484 A.2d at 985.

 There are two primary components of "extreme and outrageous conduct" we must consider: (1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place, for "[i]n determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris v. Jones*, 281 Md. 560, 380 A.2d 611, 615 (1977), *cited with approval in Best I*, 484 A.2d at 985. The "context" consists of the nature of the activity at issue, the relationship between the parties, and the particular environment in which the conduct took place.

 The court, in determining whether the conduct is outrageous, should first consider the nature of the activity. "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him [or her] actual or apparent authority over the other, or power to affect his [or her] interests." RESTATEMENT (SECOND) OF TORTS § 46 cmt. e. Courts carefully scrutinize a defendant's conduct "where the defendant is in a peculiar position to harass the plaintiff, and cause emotional distress." *Harris*, 380 A.2d at 615 (citing authorities); *see Contreras v. Crown Zellerbach Corp.*, 88

Wash.2d 735, 565 P.2d 1173, 1176 (1977), *cited with approval in Best I*, 484 A.2d at 986. Furthermore, the "extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." RESTATEMENT (SECOND) OF TORTS § 46 cmt. f.

 As the RESTATEMENT indicates, what is extreme and outrageous depends in large measure on the prevailing norms of society:

> Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

RESTATEMENT (SECOND) OF TORTS § 46 cmt. d. The tort of intentional infliction of emotional distress is therefore an evolutionary tort, because what was considered a "petty oppression," "trivial" or merely "inconsiderate and unkind" fifty years ago may be "extreme and outrageous" conduct under today's social standards and principles (or vice-versa). In general, "[i]t is for the trier of fact to determine, taking into account changing social conditions and plaintiffs own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage." *Contreras*, 565 P.2d at 1177.

Beginning with the first decision in this jurisdiction that recognized the tort of intentional infliction of emotional distress, our courts have applied a balancing test in determining whether the alleged conduct violates prevailing social norms and is sufficiently

---

14. It is "possible to infer the existence of the second element of the tort—intent or recklessness—from the very outrageousness of a defendant's conduct." *Sere*, 443 A.2d at 37; *see Waldon*, 415 A.2d at 1077.

outrageous to ensure that "[t]he advantage to society of preventing such harm seems greater than the advantage of leaving ill-disposed persons free to seek their happiness in inflicting it." *Clark v. Associated Retail Credit Men,* 70 App.D.C. 183, 186, 105 F.2d 62, 65 (1939); *accord Waldon,* 415 A.2d at 1078. In *Clark,* the trial court had dismissed plaintiff's complaint alleging that the defendant had attempted to collect a debt from him by writing several threatening letters and engaging in a calculated course of conduct to take advantage of plaintiff's poor health. In ruling that the plaintiff had properly stated a claim for intentional infliction of mental distress, the United States Court of Appeals for the District of Columbia Circuit based its reasoning in part on the awareness that under the law "[t]here [was] a growing tendency to check offensive collection methods." 70 App.D.C. at 188, 105 F.2d at 67.

In *Contreras v. Crown Zellerbach,* the trial court had dismissed the plaintiff's claim for relief which alleged Crown Zellerbach's employees and agents had subjected plaintiff, a Mexican–American, "to continuous humiliation and embarrassment by reason of racial jokes, slurs and comments" and, after plaintiff's wrongful discharge, had wrongfully accused him of stealing property, thereby preventing him from seeking and holding employment. 565 P.2d at 1174. In reversing the judgment of dismissal, the Washington Supreme Court rejected the defendant's contention that the plaintiff, because he was a truckdriver, should "have become accustomed to such abusive language." The court stated:

> As we as a nation of immigrants become more aware of the need for pride in our diverse backgrounds, racial epithets which were once part of common usage may not now be looked upon as "mere insulting language." Changing sensitivity in society alters the acceptability of former terms.

*Id.* at 1177.

Similarly, six years ago, in a Title VII case, the Supreme Court of the United States recognized the change in the law of sex discrimination and changing social standards of proper conduct in the workplace. The Court's observations are useful in discerning what also would be outrageous conduct in a common law tort of intentional infliction of emotional distress. In *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Court unanimously held "that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." In doing so, the Court acknowledged that

> "Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."

*Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). The Court added the caveat that "[f]or sexual harassment to be actionable [under Title VII], it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (internal quotation marks and brackets omitted). Two years before *Vinson,* this court recognized that a hostile work environment produced by sexual harassment can provide a factual basis for the kind of intentional tort action at issue here. We said that "women suffer sexual harassment in the workplace, based on outmoded sexual stereotypes and male domination of subordinate female employees," and we concluded that "[c]reation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress." *Best I,* 484 A.2d at 986.

In the present case, Kidd did not allege that appellants had engaged in the type of gross quid pro quo harassment she proved Carter had committed against her. Rather, she alleged and attempted to prove that appellants knew—on the basis of her grievances, including eventually the OHR complaint—that she was complaining of Carter's

sexual discrimination and intimidation; that she turned to appellants, as Carter's supervisors, to put a stop to his behavior; and that they were deliberately indifferent to her pleas for assistance, thereby frustrating her attempts to grieve to them as purportedly neutral administrators. Furthermore, with respect to appellant King, Kidd also alleged that he had actively worked with Carter in a biased manner to resolve the grievance she addressed to King, and that, after Kidd had filed a sexual harassment complaint with OHR, King had participated with Carter in a scheme to protect Carter and to retaliate against Kidd by impermissibly changing her "reassignment" status to a "detail."

In reviewing the decision of the trial court to submit Kidd's tort claim to the jury, we thus must answer the following question: given the context and nature of appellants' conduct—as shown by the evidence at trial—and considering that conduct in light of contemporary social norms, was the evidence as a matter of law sufficient to prove appellants' conduct was "extreme and outrageous"? With respect to appellant Lambert, we answer "no"; with respect to appellant King, we answer "yes."

### 1. Appellant Lambert

 The jury heard the following evidence concerning Lambert's conduct: after King had rejected Kidd's grievance against Carter, Lambert failed to respond in any way to Kidd's handwritten grievance (complaining about Carter's harassment and the biased way King had handled Kidd's informal grievance) delivered to his office and received by his secretary;[15] he did not attend a department training session on detecting sexual harassment in the workplace; as director of the department he did not sponsor any training seminars on sexual harassment other than those required by OHR regulations; and he received a copy of Kidd's OHR sexual harassment complaint after he failed to respond to her handwritten grievance. Even viewing the evidence in the light most favorable to Kidd, we conclude that the foregoing acts do not establish a prima facie case of intentional infliction of emotional distress.

15. Lambert testified he never saw the grievance.

Although the evidence might show Lambert neglected a duty, it is a type of neglect attributable to "employer-employee conflicts," *Best I,* 484 A.2d at 986, and thus as a matter of law was not "so extreme and outrageous as to permit recovery," *id.* at 985.

### 2. Appellant King

In assessing the trial court's decision to submit the question of King's liability for intentional infliction of emotional distress to the jury, this court must consider the evidence of King's conduct both before and after Kidd filed her sexual harassment complaint with OHR on September 1, 1988.

At the close of plaintiff's evidence, the trial court ruled on appellants' motion for directed verdict on the Title VII claim:

[We] have a complaint, and even if we forget the sexual harassment, just harassment complaint of the magnitude that the plaintiff presented, and although it was not clear I would have to say that it was sexual in nature, I would have to say that if [King] were really a concerned supervisor, [he] could read the plaintiff's complaints [about Carter] as having an undertone of sexual issues, certainly worth exploring, and I believe that the plaintiff's testimony was that she was available to discuss it. [King] never even talked to her. What he did instead was go back to the alleged perpetrator [Carter] and ... let the perpetrator respond to [plaintiff] that [Carter was not] guilty, and [ ] then basically took the perpetrator's position. . . .

As discussed above in Part II.B., Kidd could not use intra-agency grievance procedures to deal with her sexual harassment claim. *See* D.C. Personnel Regulations § 1632.1(*o*), 34 D.C.Reg. at 1878. More specifically, Mirtis Coggins of the District's Personnel Office, with responsibility for matters relating to DAS at the time in question, testified that a grievance containing sexual harassment claims "[s]hould be remanded back to the employee," who should be "informed of the correct procedures to follow." She also explained that an employee with a sexual harassment complaint should "file

first with the EEO counselor in the agency[, who] has 21 days to respond." After that, the employee "can go outside to the Office of Human Rights."

At trial Kidd stated her reasons for pursuing only the intra-agency grievance route at first instead of immediately filing a sexual harassment complaint: "I didn't want a confrontation. If I could have got this settled informally, I would have. I tried." On cross-examination, she added a reference to her fears of Carter to her explanation: "I'm saying the man threatened me. He told me where his clout was."

District Personnel Regulations § 1634.1(a) directs agencies to "[a]dminister a grievance system in accordance with [the other regulations in] this chapter." 34 D.C.Reg. at 1880. Lambert testified that the previous director of DAS had established grievance procedures that "referred to" the D.C. Personnel Regulations. No one produced these apparently unpublished internal DAS directives in court. For the most part, however, Kidd's description of her actions in the spring and summer of 1988 accords with the procedures set out in D.C. Personnel Regulations §§ 1638 and 1639, 34 D.C.Reg. at 1882–83. These regulations provide the context for judging King's actions toward Kidd.

On April 22, 1988, Kidd wrote Carter a memo complaining of "office harassment," following up previous conversations. According to D.C. Personnel Regulations § 1638.2, an employee should begin the grievance process with an informal complaint, "either orally or in writing." Section 1638.1 requires that it "contain a full and detailed explanation of the dissatisfaction and the remedy sought." Under § 1638.3, the informal grievance "should normally be decided by the lowest level official with authority to grant the relief sought." In Kidd's case, that official was Carter. According to § 1638.4, Carter had twenty days to render a decision on the informal grievance. That date would have been May 12, 1988, but Carter did not respond. Instead he wrote Kidd a letter of direction, i.e., a reprimand (or "adverse action"), on May 18 after she walked out of his office and let the door slam. In Kidd's rebuttal to Carter's reprimand, she "told him

that as a result of him not responding to [her] informal grievance on office harassment that [she] was going to go with a formal grievance to his supervisor for relief."

According to D.C. Personnel Regulations § 1639.1, an employee is "entitled to present a grievance under the formal procedure when the following criteria have been met:

(a) The employee has not received a decision under the informal grievance procedure within the time specified in § 1638.4; or the employee has been denied the relief sought under the informal grievance procedure as provided in § 1638.5; and

(b) The employee files the formal grievance within ten (10) days after expiration of the time for decision or receipt of notification of denial of the relief sought, as appropriate."

Carter's response (or failure to respond) satisfied requirement (a). Kidd complied with requirement (b) by filing her formal grievance with King on May 19, 1988.

Kidd addressed her complaint to King, Carter's supervisor, in compliance with § 1639.5, which requires that a "formal grievance shall be referred to a deciding official, who shall be at a higher administrative level, if possible, than the official who denied the grievance under the informal procedure." Section 1631.1 defines "deciding official" as "[a]n official who is authorized by the personnel authority to make the final agency decision on the formal grievance." 34 D.C.Reg. at 1876.

Kidd's written grievance to King, which was part of the evidence at trial introduced through Kidd's testimony, included allegations of threats and mistreatment and the assertion that "supervisors should not be allowed to use their title to constrict, harness and abuse subordinates' employee rights and human rights." More specifically, Kidd also stated in the grievance filed with King that the letter of direction Carter had placed in her personnel file was "unwarranted and untrue," that Carter had repeatedly "belittle[d]" her, that he had told other employees to stay away from her, and that Carter had threatened to transfer her because of her

complaints of harassment and unfair treatment. Finally, Kidd expressed feelings of helplessness and sickness and stated that she "fear[ed] for repr[i]sals or retaliatory actions against" her.[16]

According to D.C. Personnel Regulations §§ 1639.7 and 1639.10, the deciding official must issue a decision in writing within sixty days. Before King took any action, however, Kidd filed an amendment to her formal grievance alleging that Carter had taken retaliatory actions against her for filing the grievance, including not allowing her to continue her previously assigned work projects. Kidd testified that King rebuffed "about five or six attempts" to set up a meeting before he responded on June 13, 1988, with a list of questions he needed answered "in order [to] render a fair hearing and decision." King testified that Carter had drafted part of that letter, giving King questions about "things that he couldn't answer without specifics." The letter King signed contained the following statement: "Upon receipt of this information, I will conduct a hearing and provide you with my decision." Kidd replied to the questions on June 24, but King never conducted a hearing in which Kidd participated before he issued a response to her grievance on July 21, sixty-three days after the original filing.

King's letter said that his decision was "based upon uncoorborated [sic] documents submitted by [Kidd] and conversations with Mr. Carter." In conclusion, King summarized: "Mr. Carter has demonstrated to me that he is a fair and honest person who is very reliable and dependable and shows an exceptional cooperation and teamwork spirit. You offer no evidence and I don't agree with you that Mr. Carter will take reprisal or retaliatory action against you. I strongly suggest that you make a concertive [sic] effort to resolve your differences with ... Mr. Carter." The letter also denied all three forms of relief that Kidd had requested. At trial, King admitted that Carter prepared some of this response to Kidd.

According to D.C. Personnel Regulations § 1639.9, "[i]f the relief requested [in a formal grievance] is denied ..., the employee ... shall be advised of his or her *right of appeal to the Office of Employee Appeals*...." (Emphasis added). King's final response to Kidd, however, ended by advising her "that you have the *right to submit a formal grievance to the Director of the Department of Administrative Services*...." (Emphasis added). Possibly DAS had instituted a three-step grievance procedure under the unpublished directives issued by Lambert's predecessor. Alternatively, King may have characterized Kidd's complaint to him as informal, despite her own designation. But this latter theory is weakened by the fact that, although King missed the sixty-day deadline for deciding formal grievances by three days, he would have wildly overshot the twenty-day limit for informal complaints. In either case, King's statement suggests that he did not consider himself a "deciding official" under the definition contained in § 1631.1 because he did not believe he was "authorized ... to make the final agency decision on the formal grievance"—only Lambert was.

After receiving King's response, Kidd went on sick leave at the recommendation of her doctor. During that period, she hand wrote her formal grievance to Lambert, filed on July 29, 1988. In it Kidd complained both about Carter's acts and about the way King had handled her grievance. Under the sixty-day rule for formal grievances, Lambert had until September 27, 1988, to respond to Kidd. When she received no answer, she filed an appeal with the Office of Employee Appeals; it was still pending at the time of trial.

▪ If this had been the extent of the evidence of King's acts, we would agree with appellant that the portion of *Best I* dealing with "employer-employee conflicts" is controlling. 484 A.2d at 986–87. In *Best I*, we held as a matter of law that evidence of interference with an employee's professional responsibilities—in contrast with evidence of a pattern of sexual harassment—was insufficient to prove extreme and outrageous conduct. *Id.* at 985–87. Looking at the record in this case, we note, first, that there is undisputed evidence that King did not give

---

16. Kidd also attached a copy of the grievance she had sent to Carter.

Kidd a fair hearing on the grievance she filed with him; he decided her grievance by looking only at her written presentations while discussing the case in person with Carter— and then allowing Carter to prepare part of King's response denying Kidd's grievance. Indeed, King reneged on a promise he had given in writing to Kidd saying that he would hold a hearing if Kidd replied in writing to King's questions (which she did). Nonetheless, we cannot conclude that King's actions in finally responding to Kidd's grievance amounted to extreme and outrageous conduct. King's conduct to that point was of a type attributable to "employer-employee conflicts [which] do not, as a matter or law, rise to the level of outrageous conduct." *Id.* at 986.

■ But the evidence concerning King's actions does not end here. There is additional evidence sufficient for the jury to find that appellant King actively participated in Carter's retaliatory actions against Kidd during the period *after* King's final response to Kidd's grievance against Carter lodged with him. Once Kidd filed a sex discrimination complaint with OHR on September 1, 1988, expressly alleging Carter's sexual harassment, King soon learned of it. The jury could reasonably infer that this complaint put a new light on the history of Kidd's grievance against Carter that King had reviewed—and that King should have realized this. Moreover, there is evidence from which the jury reasonably could find that, despite this new light on Kidd's grievance against Carter, King took active steps to help Carter defeat the OHR complaint. It is this second phase of King's conduct that provides the critical mass of evidence justifying liability. Such retaliatory conduct, like sexual harassment itself, as we held in *Best I,* is "so extreme and outrageous as to permit recovery," *id.* at 985, and is not attributable to "employer-employee conflicts," *id.* at 986. We examine King's conduct in this second phase in some detail.

When Kidd returned to work from her sick leave in August 1988, she found herself locked out of her office and discovered that her computer, printer, and many personal belongings were missing. That day Linton Cheers, Chief of the Personal Property Management Division of DAS, approached Kidd and informed her that, while she was on leave, he and Carter had arranged for her transfer to his division. Given the situation, Kidd acquiesced in the transfer. On September 1, 1988, shortly after leaving Carter's office—and while the appeal of her formal grievance was pending at the Office of Employee Appeals—Kidd filed her sex discrimination complaint with OHR. For the first time, she expressly alleged Carter had committed numerous acts of sexual harassment.[17]

When Cheers requested Kidd's transfer and initiated the paperwork in early August 1988, he specified her "reassignment," which would have required a budgetary shift of one position from Carter's office to Cheers's but would have preserved Kidd's career track, maintaining her eligibility for promotion. In mid-September, however, after Kidd had filed her sexual harassment complaint, Cheers received a copy of a memo from a financial officer, written "[p]ursuant to a telephone conversation with Robert King," indicating that Kidd had instead been "detailed" to his office for a period not to exceed 120 days. This temporary, "detail" status in effect withdrew Kidd's eligibility for a promotion. The financial officer's memo, however, also directed Carter's office to "identify a permanent position number" to shift to Cheers's office "to effect the reassignment of Ms. Kidd" and thus preserve her career track.

According to Kidd, after this change in her paperwork, King "called [her] to his office," where "[h]e told [her] that Mr. Carter wanted him to get a statement from [her] stating that [her] detail ... was voluntary, that Carter said it would help him in" answering her sexual harassment complaint against him. When she refused, King called a meeting of Carter, Cheers, and Cheers's supervisor. By then Cheers had come to believe that Carter "wasn't going to effect the reassignment." At the meeting held "in an effort to resolve the issue," Carter explicitly attributed "his reluctance to process the paperwork as

17. OHR ultimately dismissed the complaint, a fact that was brought to the jury's attention.

[Cheers] had requested to a harassment suit or claim that Ms. Kidd had levied on him." Cheers testified that "Mr. Carter pretty much took over the meeting," while King "was rather quiet" and "just allowed Mr. Carter to run the meeting." According to Cheers, Carter indicated he would cooperate with the reassignment if Cheers would get his supervisor to sign a memo, addressed to King, recounting the circumstances of Kidd's transfer. Although Cheers complied with this request and asked Kidd to sign the document as well, he testified that "the reassignment didn't happen anyway."

The following April 1989, while Kidd was on another detail back under King, she wrote to him through her immediate supervisor asking for a promotion. He responded three months later that she was not eligible for a promotion because she "was detailed" at her own request. In an answer to King's memo, Kidd denied requesting a detail and "told him ... that his reasons for taking [her] out of [her permanent position] were in violation of the regulations."

In reviewing the above evidence, we must examine King's actions as a whole and in context and cannot ignore the connections between his conduct and his awareness of Kidd's allegations against Carter. We take this approach because a series of actions "may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." *Boyle v. Wenk*, 378 Mass. 592, 392 N.E.2d 1053, 1056 (1979) (citing cases), *cited with approval in Best I*, 484 A.2d at 985. We are not saying the jury could impute to King full knowledge of all Kidd's allegations against Carter, let alone knowledge as to whether Carter was in fact culpable. We are saying, however, that the jury properly could take account of King's arguably unfair handling of Kidd's original grievance, implying bias against her; the jury could then factor in King's awareness that Kidd had filed a complaint of sexual harassment against Carter with OHR; and, finally, the jury could add into the equation

the evidence that King, in light of very serious allegations against Carter, nonetheless committed overt acts trying to help Carter defeat Kidd's OHR complaint *whether it had merit or not.*

Granting Kidd "the benefit of every rational inference" from the above evidence, as we must, *Sere*, 443 A.2d at 38, we conclude that a jury could reasonably find that King participated with Carter in a course of conduct designed to retaliate against Kidd for filing a sexual harassment complaint. More specifically, King approached Kidd and asked her to sign a statement that would in effect absolve Carter from any foul play in Kidd's transfer. When Kidd refused, King assisted Carter in blocking Kidd's "reassignment" to Cheers's division, resulting in Kidd's transfer designation as a temporary detail, without right of promotion. The negative consequence for Kidd—as enforced by King—was that she was denied a promotion until months after she would have been otherwise eligible.

Whether or not King's conduct in fact met the Title VII definition of sexual harassment, a question we need not answer, the evidence was sufficient to prove that his treatment of Kidd and collusion with Carter constituted a serious abuse of his supervisory authority that took advantage of Kidd's vulnerable position as a woman employee who had repeatedly complained about the acts of her immediate male supervisor. King's conduct thereby contributed to the "intimidating, hostile, or offensive working environment" Kidd was forced to endure,[18] had a detrimental impact on her employment opportunities, *see Contreras*, 565 P.2d at 1174, and was "sufficiently severe or pervasive to alter the conditions of [Kidd's] employment and create an abusive working environment," *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (internal quotation marks and brackets omitted) (establishing standard under Title VII).

Our society's increasing sensitivity to (and the judiciary's increasing acknowledgment of) the subtle and not so subtle forms of sexual harassment, pervasive in both govern-

---

**18.** Equal Employment Opportunity Commission, Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.11 (1992).

ment and private workplaces, has elevated acts constituting both sexual harassment and retaliation against those who complain about and seek redress for sexual harassment from "petty oppression" to outrageous and intolerable conduct. RESTATEMENT (SECOND) OF TORTS § 46 cmt. d; *see Best I,* 484 A.2d at 986; *Contreras,* 565 P.2d at 1177.[19] The jury reasonably could find that appellant King, by retaliating against Kidd on Carter's behalf when Kidd turned to OHR to enforce her rights, embarked on a course of conduct—in cooperation with Carter, Kidd's alleged sexual harasser—that frustrated the District of Columbia's public policy goal of detecting, combatting, and eliminating sex discrimination. *See, e.g.,* D.C.Code § 1–2501 (1992 Repl.) (District of Columbia Human Rights Act, "Intent of Council").

In *Best I,* we stated that "[a]ctions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress." 484 A.2d at 986. Applying the same balancing test we have used in previous cases involving intentional infliction of emotional distress claims, we affirm that "[t]he advantage to society of preventing" harms caused by supervisory conduct such as King's is clearly "greater than the advantage of leaving ill-disposed persons free to seek their happiness in inflicting it." *Clark,* 70 App.D.C. at 186, 105 F.2d at 65.[20]

Accordingly, we hold that the evidence against appellant King as a matter of law was sufficient to prove intentional infliction

of emotional distress, as found by the jury. We conclude, however, that the evidence against appellant Lambert was insufficient and thus that the trial court erred in submitting to the jury the tort claim against Lambert—which the trial court shall dismiss on remand. We affirm the judgment below in all other respects.

### Postscript

In light of the dissent, it is important to keep in mind the central point of this opinion: on this record a jury reasonably could find that (1) appellant King, Carter's immediate supervisor, became aware of Kidd's allegations of sexual harassment against Carter, but nonetheless (2) King colluded with Carter to retaliate against Kidd for filing her OHR complaint against Carter and to cover up Carter's actions. For these reasons, the case against King for intentionally inflicting emotional distress on Kidd was properly submitted to the jury; *i.e.,* there was enough evidence to meet the evidentiary threshold required to present a jury question: whether "reasonable people could differ on whether [King's] conduct [was] extreme or outrageous." *Best I,* 484 A.2d at 985.

Rather than dealing with this analysis, the dissent essentially makes an argument to the jury for rejecting Kidd's complaint. Thus, the dissent fails to look at the evidence in the light most favorable to the plaintiff, Kidd, and accordingly ignores this court's standard of review. *See Sere,* 443 A.2d at 38. The

19. Sexual harassment threatens women in their jobs. It hinders women in getting, enjoying, and keeping a job. It is not intrinsically non-work-related because it is sexual. When it has an impact upon fundamental employment decisions and upon the workplace atmosphere, sexual harassment is discrimination in employment. Title VII explicitly prohibits sex discrimination in "terms, conditions, and privileges of employment." In many circumstances, sexual requirements are used to deny women access to "privileges" of employment. In situations in which sexual threats and coercion shape a woman's job definition and working environment, or cases in which job-related pressures are used to coerce sexual acquiescence or involvement, sexual harassment is a "term" and "condition" of work. It can be a prerequisite for employment and a persistent quality of it. As a practice, sexual harassment

distinguishes women for undesired compulsory sexual attention to their detriment as working people, whether they are compelled to comply or are able to resist. The employment discrimination consists not only in retaliation for refusal of advances, but also in the imposition of the sexual condition itself, which places the woman in the position of having to choose between tolerating or complying with sexual demands on the one hand and suffering employment deprivation on the other. CATHARINE A. MACKINNON, SEXUAL HARASSMENT OF WORKING WOMEN 208 (1979) (footnotes, brackets and some internal quotation marks omitted).

20. *Compare Waldon,* 415 A.2d at 1078 (harm resulting from university chairperson's acts in terminating professor's employment minimal compared with chilling effect liability would impose on faculty decisionmaking process).

jury rejected the dissent's view of the evidence, as it had the right to do.

The dissent's complaint that the majority dwells improperly on the evidence against Carter is incorrect because that evidence is integral to the case against King as a colluder. Although King may not have known whether Carter, in fact, had engaged in the harassment Kidd alleged, there is evidence showing that he was aware of the seriousness of the allegations and that he nonetheless, as a supervisor, assisted Carter in trying to retaliate against Kidd and to cover up the situation whether Kidd's complaint had merit or not. Once the jury could reasonably find that King knew of Kidd's claims against Carter, then the jury also could reasonably find that King had a responsibility as Carter's supervisor to facilitate the resolution of Kidd's complaint impartially—a responsibility which King not merely walked away from but affirmatively rejected by trying to help Carter fend off the complaint without regard to its merits. Accordingly, given the evidence presented to the jury about Kidd's claims against Carter, the jury reasonably could find that King's alleged ignorance of the situation was hollow and inexcusable for a supervisor, and that King's efforts to help Carter defeat Kidd's OHR complaint amounted to extreme and outrageous con-

duct.[21] If King believed he was prejudiced by the joinder of the claim against him with the claim against Carter, he could have moved for a separate trial under Super.Ct.Civ.R. 20(b) ("The Court ... may order separate trials ... to prevent ... prejudice."). He did not do so, nor does he claim on appeal—nor could he—that the evidence against Carter is irrelevant to Kidd's claim against King.[22]

The dissent ascribes "overtones of a violation of due process of law" in our disposition of King's appeal. *Post* at 680. If any due process violation occurred, it was in King's treatment of Kidd's internal grievance, a process that the dissent characterizes as "an intelligent way to explore administratively the merits of her complaints." *Post* at 683. That statement ignores the record viewed in the light most favorable to Kidd. For example, Kidd submitted in evidence a letter in which King promised that in processing her initial grievance, he would hold a hearing if she provided additional information in response to the questions he sent her. King testified that Carter drafted part of this letter. When Kidd complied with the request for additional information, however, King reneged on his promise to hold a hearing. The evidence shows that King responded to

**21.** The dissent objects to this opinion's description of "the revolting sexual relationship" that Carter imposed on Kidd. According to the dissent, "[w]hen Kidd and Carter were engaging in these acts, King had no knowledge of it because the indication is he not only did not know Kidd but, so far as it appears, he probably was not even then employed in the governmental agency." *Post* at 680. Kidd testified, however, that the incident to which the dissent is referring occurred in February 1988, while King testified that he began work at the agency on February 14, 1988. But even more importantly the point remains: even if King did not know the details of Carter's interactions with Kidd, as presented in this joint trial, at the time that they occurred, the jury could nonetheless find that King took it upon himself to help Carter retaliate against Kidd and cover up whatever happened—a "hear no evil, see no evil" approach that intentionally violated King's responsibility as a supervisor to be sure conduct of the sort alleged was not tolerated.

**22.** In arguing against our reference to possible severance, the dissent contends "the majority

overlooks that in the trial court a sexual harassment charge was levelled against King, for some reason, though he was of course found not guilty of any sexual harassment by the jury," suggesting in a footnote that this claim was somehow related to a short period of psychiatric treatment Kidd underwent in the process of leaving her former employment with the federal government. *Post* at 680. As we explained in Part III.B., however, the sexual harassment claim against King was based on a theory of liability requiring the jury to determine whether King "knew or should have known" about Carter's harassment of Kidd "and failed to take prompt remedial action." The dissent does not explain why such a claim against King would preclude a motion for a separate trial. Although courts generally seek to avoid duplicating trials of the same matters, a trial court's decision to grant separate trials under Rule 20(b) is not disturbed except for a clear abuse of discretion. *See* 7 Charles A. Wright et al., Federal Practice and Procedure § 1660 (1986). In any event, whether a severance would have been granted or not, Kidd was entitled to have the jury hear evidence of the kind of harassment by Carter that King was charged with intentionally covering up.

Kidd's grievance by reviewing documents submitted by Kidd while conducting conversations with Carter. King thereby ignored the due process implications of dealing unevenly with the parties to a dispute he had a formal responsibility to resolve fairly. King refused to meet with the complainant (Kidd) while meeting with the person against whom the complaint had been lodged (Carter), *and* King authorized the latter to help prepare a denial of the grievance.

The dissent concludes that King's procedures for reviewing Kidd's formal grievance amounted to "a reasonable, and not a malicious, thing for an executive to do." *Post* at 683. In contrast, we emphasize the jury's reasonable focus on King's duty as a supervisor to deal equally with all parties to a dispute he was responsible for resolving. The dissent, however, excuses King for showing partiality toward Carter because King knew Carter better than King knew Kidd. The dissent states: "While [Kidd's] complaint was partially against Mr. Carter, he was an assistant of Mr. King in whom [King] then had confidence...." *Post* at 683. The dissent's assessment of King's procedures completely reverses the approach reasonably accepted by the jury: an emphasis on a supervisor's duty to suspend judgment while investigating a complaint with the greatest impartiality possible under the circumstances. The dissent's summary of the evidence concerning King's treatment of Kidd's grievance also completely ignores the fact that King reneged on his promise to Kidd to hold a hearing once she responded to his additional questions.

We have stressed that, before September 1, 1988, King's actions of the sort just described, while perhaps justifying an inference of bias against Kidd, as a matter of law did not present a jury question of extreme and outrageous conduct. But we have also pointed out that, once Kidd filed her sexual harassment complaint on that date and King learned soon thereafter that this alleged harassment was at the heart of Kidd's grievance against Carter, a jury reasonably could find that King's actions as Carter's supervisor were not merely negligent toward Kidd; rather, they reflected active participation

with Carter against Kidd, colluding in Carter's retaliatory actions and covering up his wrongs. More specifically, considered in the light most favorable to Kidd, the evidence of events after Kidd filed her sexual harassment complaint shows the following actions by King in support of Carter, with knowledge of Kidd's allegations of sexual harassment against Carter:

1. After a telephone conversation with King, a financial officer changed Kidd's transfer from the permanent "reassignment" requested by her new supervisor, Cheers, to a temporary "detail" with no potential for promotion.

2. In order to help Carter answer, and thus defend, Kidd's sexual harassment complaint, King called Kidd into his office to tell her that Carter wanted Kidd to make a statement that her temporary detail was voluntary (contrary to her agreement only to a permanent reassignment).

3. At meetings attended by Carter and by Cheers and Cheers's supervisor, King facilitated Carter's demand that, before Carter would allow Kidd's temporary detail to be reconverted to a permanent reassignment—providing, once again, the potential for promotion—Kidd would have to produce a statement that would help Carter defend against Kidd's sexual harassment complaint.

4. In 1989, King refused Kidd's request for a promotion because she was still on a "detail" which King, untruthfully, said was voluntary.

This evidence of King's support for Carter once King knew Kidd's basic complaint was sexual harassment was sufficient for a jury to find King responsible for "extreme and outrageous" conduct, *Best I,* 484 A.2d at 985, as a supervisor responsible for protecting employees under Carter's control. This evidence would allow a jury to infer that King colluded with Carter to withdraw Kidd from a permanent assignment status, in order to pressure her to help Carter defend against her OHR complaint. Just as sexual harassment in the workplace cannot be considered merely as an instance of typical "employer-employee conflicts," *id.* at 986, the actions of a supervisor assisting in retaliation against

an employee who complains of sexual harassment cannot be deemed an inherent part of the employment situation either.[23]

The dissent claims we "argue that during a time Ms. Kidd was on leave, there was a *clandestine arrangement* by Ms. Kidd's superiors to transfer her to a different division." *Post* at 685 (emphasis added). On the contrary, we recognize that in August 1988 Kidd accepted a reassignment to the division supervised by Linton Cheers, Chief of the Personal Property Management Division of DAS. We do conclude, however, that the evidence would allow a jury reasonably to infer that, after Kidd filed her sexual harassment complaint against Carter with OHR on September 1, 1988, King colluded with Carter to change Kidd's permanent reassignment with Cheers to a temporary detail, without right of promotion, until she assisted Carter in defending against her own complaint.

Cheers testified that when he spoke with Carter about Kidd's reassignment in July 1988, Cheers indicated that he not only needed to have Kidd herself working for him but also required a transfer of Kidd's "position number," *i.e.*, an authorization for an additional employee in Cheers's division. Otherwise, Cheers would not formally have a position available for which he could pay Kidd. With the understanding that Carter had agreed to this arrangement, Cheers sent through the paperwork for Kidd's reassignment. After Kidd filed her OHR complaint on September 1, 1988, however, according to Cheers, Carter expressed his reluctance to transfer the position number, a reluctance that effectively changed the plan for Kidd's permanent reassignment into merely a temporary detail in Cheers's division. From this evidence, therefore, the jury could reasonably infer that in July 1988, before Kidd filed her OHR complaint, Carter had been willing to lose a position in the Space Utilization Division in order to get Kidd out of his office, but that after Kidd had filed her OHR complaint, Carter's willingness to give up a position changed. More specifically, the jury

could infer that, beginning in September 1988, Carter used the position number as a bargaining tool with Kidd, refusing to authorize its transfer to Cheers until she provided Carter with a statement that would help him defend against her OHR complaint. Significantly, for purposes of this appeal, King assisted Carter with this scheme in the ways we explain.

Cheers also testified that he received a copy of a memo addressed to his supervisor, Bruce Gordon, conveying the information that Kidd had been temporarily detailed instead of permanently reassigned. This memo indicated that the financial officer who wrote it made the change "[p]ursuant to a telephone conversation with Robert King." Cheers further testified that he did not know who changed the reassignment to a detail. When asked "who, in the normal course of things, would have the authority" to make such a change, Cheers replied with a list that included both Gordon and King, as well as Carter himself. Cheers's testimony, supplemented by a copy of the memo from the financial officer, which was introduced in evidence, allowed the jury to find that King arranged for Kidd's permanent reassignment to be converted into a temporary detail after Carter began to back away from his original agreement with Cheers.

The dissent also states that Cheers testified that "during all the time Ms. Kidd was in his division he never had a position number to give back to Mr. Carter." *Post* at 687. We agree that this fact explains why Kidd's detail could not be reconverted to a reassignment once Carter was no longer willing to lose a position in his office. Cheers testified that under his original arrangement with Carter, made in July 1988, "as soon as [Cheers] had a position number become vacant [Cheers] would transfer that position number back to" Carter's division. The agreement between Carter and Cheers hinged on Carter's willingness to give up Kidd's position number before receiving one in return, presumably to get Kidd out of his

---

**23.** The dissent repeatedly calls the majority to task for failing to deal with *Thompson I*, especially the discussion at *id.*, 570 A.2d at 290. We have declined to do so—relying instead on *Best* *I*—because in *Thompson II*, 593 A.2d at 624–25, this court vacated Part IV. of *Thompson I* containing the discussion on which the dissent relies.

office more quickly. With Kidd away on a detail, however, Carter no longer had to deal with her on a daily basis, and he successfully prevented her return to his office when her detail with Cheers ended. The jury could infer from the evidence that Carter only began to demand the immediate transfer of a position number from Cheers after Kidd filed her complaint with OHR on September 1, 1988, and that King assisted Carter in executing this plan.

Finally, the dissent argues that even if Kidd's promotion to Grade 11 was delayed "months after she was legally eligible to receive it," such a delay cannot as a matter of law constitute intentional infliction of emotional distress. *Post* at 687. This argument misses an essential point about the evidence underlying the jury's verdict. Kidd testified that she began the process of requesting a promotion to Grade 11 in March 1989, after she left Cheers's office on a new detail, back in King's division, under a new supervisor, Jeanette Wills. A month later, in April 1989, Kidd directed a memo to King through her supervisor, asking him for the promotion. Kidd testified that King did not respond for three months and then denied her request: "He told me that because I was detailed that I wasn't eligible for a promotion. He stated that it was my request to be detailed." Kidd further testified that "[a]fter about three more tries by [her] supervisor," Jeanette Wills, she was promoted to Grade 11 on December 29, 1989. The delay of Kidd's promotion was one aspect of the harm she suffered. But the delay had an even broader impact. It was also evidence of the means by which King intentionally furthered Carter's scheme of retaliation against Kidd for filing a sexual harassment complaint with OHR. Thus, the jury could find that Kidd suffered more than a delayed promotion; there was also severe emotional distress resulting from the same cause: King's collusion with Carter in pressuring Kidd to help Carter defend against Kidd's own OHR complaint.

We have held that "[c]reation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress." *Best I*, 484 A.2d at 986. The jury found that this is such a case. The record contains "sufficient evidence" to support the jury's verdict.

*Affirmed in part, reversed in part, and remanded.*

GALLAGHER, Senior Judge, dissenting:

This decision severely stretches the application of existing law on "intentional infliction of emotional distress" well beyond our controlling opinions in this jurisdiction. It has disturbing social and economic implications for the workplace where there are, as there usually are, personnel frictions and the supervisors and employees involved are of the opposite gender. I would think that, for these reasons, this serious extension of the existing law would merit en banc consideration as it would have a far-reaching effect, as a matter of reality. One reason this case is something of a landmark case is that it establishes a different factual guide for intentional infliction of emotional distress, as we shall see later on.

### I.[1]

In the final analysis, the opinion in this case stands for the proposition, in the law on intentional infliction of emotional distress, that (a) if a complaining employee files several written grievances to various officials concerning her supervisors, and office frictions, over a period of months and then much later changes the substance of her complaints to a charge before the Office of Human Resources that her supervisor had sexually harassed her, and (b) after this new complaint before that agency was filed a newly received assignment, which she had long sought, was changed from a reassignment to a 120–day detail, and (c) she later received a grade raise but, due to the 120–day detail, this occurred some months beyond her eligibility for it, this will support a judgment against

1. I do not discuss the jurisdictional issue being more concerned about the extension of the law on this tort.

one of the participating agency executives, in this administrative action, for the tort of intentional infliction of emotional distress.[2] This tort, by its nature, necessarily has the element of maliciousness.

In the process of seriously stretching the law on this tort to a new dimension, the majority judges also seem to tell us that when an employee sends a written grievance to the supervisor of her supervisor, complaining about frictions with her supervisor and another employee, there are "due process implications" if the executive then discussed with his assistant (the supervisor) the charges the complaining employee had made, asked him to prepare specific written questions for submission to the complainant, and when answers to these questions were received, sent her a memorandum in which, in effect, he rejected her grievance, giving his reasons, but without giving her a "hearing." This absence of a "hearing" procedure, says the majority, raises "due process implications." This, in itself, may send some tremors through the government and private industry.

Before penetrating the majority opinion on the essentials of the case it weaves against appellant King, I feel I should say in the interest of fundamental fairness that the recitation of the inflammatory details of the lurid sexual relations between Carter and Ms. Kidd is most unfortunate. As we know, *Carter* (a) *is not a party to this appeal,* and (b) Ms. Kidd has secured a judgment against him in the trial court for sexual harassment. But this appeal is a different matter. To employ against appellant King in this appeal those details of the revolting sexual relationship ("rupturing her anal tissues" "causing her to fear AIDS")[3] between Carter and Kidd has overtones of a violation of due process of law as to King. These are events of which he had no knowledge and had utterly no responsibility. When Kidd and Carter were engaging in these acts, King had no knowledge of it because the indication is he not only did not know Kidd but, so far as it appears, he probably was not even then employed in the governmental agency. It strikes me as an injustice for the judges in the majority nevertheless to employ this inflammatory evidence against King in this appeal.

But, says the majority, "that evidence is *integral* to the case against King as a colluder." (Emphasis added.) If so, it does not speak well for the case against King if it requires that sort of unfortunate inflammatory bootstrapping.

The majority tells us, however, that (a) the lurid evidence was relevant to Kidd's claim against King and, if King "believed he was prejudiced by the joinder of this claim against him with the claim against Carter he could have moved for a separate trial," but did not do so. However, the majority overlooks that in the trial court a sexual harassment charge was levelled against King, for some reason, though he was of course found not guilty of any sexual harassment by the jury.[4] Consequently, such a motion would not lie. There is, therefore, no good reason on this appeal to harm the reputation of this government official with these disgusting details of the lurid Kidd–Carter sexual relationship, of which he knew nothing and had utterly no responsibility for under our system.

The essential difference between the majority opinion and the dissent in this important, "new-law making" decision is that the majority passes the dissent off as simply an "argument to the jury" opinion, while carefully avoiding a substantive discussion of the law on this serious tort of *intentional infliction* of emotional distress. The legal discussions they do undertake ignore the tests placed by this court on plaintiffs seeking to prove intentional infliction of emotional dis-

---

**2.** The jury returned a verdict of about a quarter of a million dollars against the defendants *jointly and severally.*

**3.** Ms. Kidd testified that she did not relate this painful injury to her doctor during several visits and so she did not support her testimony with medical records.

**4.** Kidd testified on direct examination that just before she became employed at this agency she had checked herself into the Psychiatric Institute and was treated for two weeks and then received two more weeks of out-patient treatment.

tress in the employment arena. Instead, the majority substitutes a discussion on the evolutionary patterns of "contemporary community standards of offensiveness and decency" sprinkled with the nomenclature of Title VII, and avoids facing up to the realities of our decision in *District of Columbia v. Thompson I*, 570 A.2d 277, 289–91 (D.C.1990), *vacated in part on other grounds, (Thompson II)*, 593 A.2d 621 (D.C.), *cert. denied*, —— U.S. ——, 112 S.Ct. 380, 116 L.Ed.2d 331 (1991).[5] This case cannot be fairly decided without meeting *Thompson* head-on. There, Thompson's claim of intentional infliction of emotional distress rest[ed] on the following actions: Maury [her supervisor] criticized her in memorandum after memorandum; he approved her leave and then changed her status to absence without leave; he refused to consider her for promotion to the next grade level or to give her the computer test she asked for; he isolated her from the other employees; he requested statements from her doctor as to her limited hours; he wrote memoranda on her excessive leave; *and he assaulted her and lied about it, resulting in her job loss.*

*Id.* at 290. (Emphasis added).

Against this factual backdrop, this court stated that "[w]ith the exception of the alleged assault, this conduct by a supervisor is of a type inherent in the employment situation and, on this record, was not unusually egregious.... Nor was the alleged assault—pushing Thompson against the wall and pointing of finger, coupled with threatening words—sufficiently egregious under the applicable standard." *Id.* (citations omitted).

Here, by contrast, the majority tells us "the evidence of events after Kidd filed her sexual harassment complaint shows the following actions by King in support of Carter, with knowledge of Kidd's allegations of sexual harassment against Carter," include:

1. After a telephone conversation with King, a financial officer changed Kidd's transfer from the permanent "reassignment" requested by her new supervisor, Cheers, to a temporary "detail" with no potential for promotion.

2. In order to help Carter answer, and thus defend, Kidd's sexual harassment complaint, King called Kidd into his office to tell her that Carter wanted Kidd to make a statement that her temporary detail was voluntary (contrary to her agreement only to a permanent reassignment).

3. At meetings attended by Carter and by Cheers and Cheers's supervisor, King facilitated Carter's demand that, before Carter would allow Kidd's temporary detail to be reconverted to a permanent reassignment—providing, once again, the potential for promotion—Kidd would have to produce a statement that would help Carter defend against Kidd's sexual harassment complaint.

4. In 1989, King refused Kidd's request for a promotion because she was still on a "detail" which King, untruthfully, said was voluntary.[6]

*Ante* at 677. As will become evident, not only do appellant King's actions fall significantly short of those found by *Thompson I* to be "not unusually egregious" as a matter of law, but unlike *Thompson I*, where the actions involved those of a direct, hands-on supervisor, appellant King was considerably removed administratively and, prior to these grievances, had no contact with Kidd as far

---

5. In footnote 23 of their opinion, the majority judges apparently wish to convey that *Thompson I* (which is referred to in the dissent) no longer exists as it was vacated on rehearing in order to consider a jurisdictional issue. The employment of *Thompson I* by the dissent relates to the discussion and resolution by the court on the merits of the charge of intentional infliction of emotional distress. Rehearing in *Thompson* was granted to decide the jurisdictional issue raised. Rehearing was granted therefore on other grounds, i.e., on grounds not relating to the merits of the intentional infliction charge, and the latter issue was not discussed on rehearing. Logically, the

vitality of the court's discussion on the merits issue remains. Nothing in *Thompson II* questioned it.

So, *Thompson I*, is utilized by the dissent as a matter of reason, not, of course, for a binding effect. From the standpoint of reason, the merits discussion there does exist. Also, even as a matter of judicial economy it would be unfortunate to waste that learned discussion of the merits issue in *Thompson I*.

6. As indicated, Ms. Kidd later received the grade promotion.

as it appears. Moreover, characterizing Kidd's delay in promotion as having "broader impact," *i.e.*, "evidence of the means by which King intentionally furthered Carter's scheme of retaliation against Kidd for filing a sexual harassment complaint with OHR," avoids the fundamental reality that, under *Thompson I*, appellant King's actions do not, as a matter of law, rise to the level of "extreme and outrageous behavior." It is understandable that the majority prefers not to attempt to square its opinion with *Thompson I*, where it reached the opposite result on facts more egregious than here, but it is necessary to do so if this majority opinion is to survive. Because the facts here do not meet the legal test, the majority resorts to conspiratorial words like "colluding," and "retaliation," as a substitute.

## II.

It would unduly labor this dissent to outline the various voluminous, written complaints of Ms. Kidd lodged up through the echelons. Accordingly, I append only her grievance to appellant King, which deserves to be read. Her complaints all followed much the same theme, being largely complaints against a stranger to this proceeding (Mr. Parks, an acting supervisor, whom she disliked) and administrative criticisms of her supervisor, Mr. Carter, against whom she obtained a judgment in the trial court in this case for sexual harassment.

I will, however, outline the complaint she made to Mr. King, as he is the remaining appellant here.[7] This is necessary for an understanding of our majority and dissenting opinions.

Ms. Kidd lodged a "Formal Grievance" dated May 19, 1988, to appellant King, who was Associate Director, Real Property Administration, Department of Administrative Services of the District of Columbia Government. [*See* Appendix.] As such, he was in supervision over Mr. Carter, who was Ms. Kidd's Supervisor. Her informal grievances about the "harassment" were translated into a formal grievance.

Her grievance relating to this harassment is here directed largely toward Mr. Parks (not a party to this proceeding) and her administrative relationship with him. She complains in the grievance that she does not know who she is supposed to be supervised by, whether it is Mr. Carter, Chief, Space Utilization, or Mr. Parks, Space Specialist. She asserts she is not "kept abreast of important details of work or events of interest." She complains of her official relationship with Ms. Darcel Henderson. She states she has been "cursed by the secretary" and called "PRISSY MISS MISSY." She complains generally about the rudeness and the profanity which goes on among the staff in the office. She charges that "telephone callers are abused, unprofessionally handled and messages are not left by the secretary." She stated this has been discussed with Mr. Carter and "he called a meeting" and reprimanded the whole staff and stated he did not want to hear "third party complaints" and "if a caller feels he is rudely treated refer them to me personally" and yet "the problems persist."

Ms. Kidd goes on along the same lines in her lengthy six page complaint and then concludes by requesting that (a) her Supervisor, Mr. Carter, rescind his letter of misconduct relating to her, and (b) she be given "an excellent performance evaluation" for her first year of service to the District government. She concluded by stating to Mr. King (appellant) that she regretted that her grievances concerning the office personnel "have to be aired to you but I have spent the past few months attempting to resolve them within the division to no avail." (Appendix.)

It is significant that in this same "Formal Grievance" she made the specific "request that *I be reassigned immediately* to a position with non-competitive promotional opportunity like in my present position...." *Id.* (emphasis added). She bottoms this request for a transfer mainly on Mr. Carter's memo of May 18, 1988 (a cautionary memo to her), which caused her no longer to have "confidence that Mr. Carter can or is capable of being fair, forceful and resourceful in resolving office problems in a [sic] equitable and

7. The judgment against appellant Lambert is be-

ing reversed, and I most certainly concur in this.

non-bias manner." She stated she feared "for reprisals or retaliatory actions against me" and "I feel stagnated and trapped not being able to network and have freedom to interact with other departmental/governmental employees for the purpose of sharing, soliciting resources or for recreational purposes." *Id.*

About two weeks later (June 8, 1988), she filed an "Amendment to Grievance" to appellant King. In this amendment, she complained, among other things, that she was not included by her Supervisor in the Mayor's Space Plan Presentation; that in a staff meeting it was announced that the Mayor's Space Presentation will be presented to the Senior Staff, Friday and "this is the first I have heard of this." She also complained to Mr. King that she has "been denied the opportunity to serve as one of RPA's representatives for the DAS' Womens Advisory Committee," which she stated, "I consider an event of interest which I feel will be of benefit in allowing me an opportunity to interface with other women throughout DAS. No reason is given by my supervisor." She continued that her supervisor "did not speak to me or make contact regarding assignments of any kind until I approached him regarding reports 2 June 88." *Id.*

She concluded her amended formal grievance to Mr. King by stating, "I believe these incidents to be reprisals/retaliations [8] and wish to amend my grievance to include them" and she "respectfully requests a meeting *or your immediate attention* to my grievance." (Emphasis added.)

The majority complains that, upon receipt of her written grievance against Messrs. Carter and Parks, appellant King called in his underling supervisor to explore the grievance with him, seemingly a reasonable administrative step to take. Mr. King decided to propound questions of Ms. Kidd in order to obtain the specifics underlying her charges. In order to accomplish this, he requested that Mr. Carter prepare for his signature appropriate questions of Ms. Kidd, and this was done. This was an intelligent way to explore administratively the merits of her complaints. This was, after all, not a quasi-

judicial hearing. This was a government administrator exploring a grievance by an employee against (a) her supervisor and (b) another employee in her office who was sometimes acting supervisor. While the complaint was partially against Mr. Carter, he was an assistant of Mr. King in whom he then had confidence and he had the particular knowledge with which to frame questions. It was a reasonable, and not a malicious, thing for an executive to do. To have one's staff assistant prepare a memorandum of questions for signature was not really an overt act in a collusion, as the majority argues. A reasonable jury would not conclude all this, adduced by Ms. Kidd, was evidence to show that appellant King intentionally inflicted emotional distress on her. As we will soon see, under our case law, this does not approach the tests we have laid down for this tort.

Instead of granting her request for a transfer because of the unsatisfactory office personnel situation she described, aggravated by personality clashes and rudeness, Mr. King sent a memorandum dated June 13, 1988, to Ms. Kidd responding to her grievances against Supervisor Carter. Assisted by Mr. Carter, Mr. King requested specifics on each of some twenty-three incidents she had complained of in her formal grievance. He later stated:

> Ms. Kidd responded in a memo dated June 24, 1988 to Mr. King, the Associate Director of her Division giving a much detailed description of the numerous frictions and personality clashes within her office—her problems with the supervisory authority of Mr. Parks, the reprimands by Supervisor Carter and the interruptions she had experienced in relation to work assignments she had given to the office secretary, Darcel Henderson.

The Associate Director later responded to Ms. Kidd's formal grievance by memorandum dated July 21, 1988. He stated he had reviewed all the information she had provided and had discussed the situation with her Supervisor (Mr. Carter). He stated, essentially, that it appeared that she is the only

8. Interestingly, the majority judges also use this term "retaliation" in their opinion.

employee who "has difficulty with Mr. Carter's decision to have Mr. Parks monitor certain projects; that Mr. Carter has informed him that 'he has had conversations with you and Mr. Parks together regarding your difficulties and requested that you get together and try to resolve your differences;'" and that "[w]hile Mr. Parks was agreeable you refused." He then observed she had a negative attitude and was not a "team player;" that her other difficulty with the clerical assistant should be considered resolved since the latter is no longer employed by the department.

Mr. King (appellant) also stated that

Mr. Carter informed me some time ago that it is his intention to involve you more in the overall responsibilities of the Space Utilization Division as outlined in your position description, thereby relieving you of the full-time responsibility for monitoring the Automated Integrated Master System Program (AIMSP). *I concur with his decision.*

(Emphasis in text.)

The Associate Director then went on to state that he would not direct Mr. Carter to rescind his "letter of DIRECTION" to her; and that he would not grant her request to direct Mr. Carter on how to rate her performance in the upcoming rating. Turning to her specific request for a transfer (reassignment), Mr. King stated it was not his policy to reassign an employee because the employee disagrees with a particular style of the supervisor; that "certain formats are given to [a supervisor] by his superiors; that if Mr. Carter prefers that certain assignments are formatted in a particular manner, as subordinate she is expected to adhere to his instructions without creating difficulties."

He concluded by stating her request for reassignment was denied.[9] He observed that Mr. Carter has demonstrated to him that "he is a fair and honest person who is very reliable and dependable," and that he did not agree "that Mr. Carter will take reprisal or retaliatory action against you." He there-

upon advised that she had a "right to submit a formal grievance to the Director of Administrative Services within ten (10) calendar days from the date of the receipt of this memorandum."

Ms. Kidd then filed a similar complaint dated July 29, 1988, about administrative matters and much the same office frictions with Captain Lambert (an appellant), Director of the Department of Administrative Services. She generally complained about the supervision of her office, especially in relation to the role of the same Mr. Parks in the office and the supervision by Mr. Carter.

She charged, among other things, that Mr. King should have listened to her side of the grievance and instead favored Mr. Carter's version concerning her grievance.

The detailed grievance concluded by requesting:

(a) Rescinding of Mr. Carters "Letter of Direction,"

(b) "Worthy Performance Rating,"

(c) An "Award/Recognition for accomplishment of building a user friendly automated space program,"

(d) *"Reassignment/I would consider remaining in this position providing I receive your word in writing that I receive equitable treatment with other male employees, that I not be harassed, and I obtain proper consideration for promotion to the GS–11 immediately upon eligibility/meeting the same standards as my male counterparts,"* [10]

(e) "That Messrs. Carter and Parks receive counseling/training in what constitutes sexual harassment, women's rights and how not to create dissension within a workplace,"

(f) That Mr. Carter receive disciplinary action,

(g) Reimbursement of all sick and annual leave to her in relation to her ongoing grievances,

---

9. Later on, however, she got her wish and was reassigned and sometime later was promoted.

10. It is rather interesting that this statement is made several months after the "sexual harassment" she later on described in a complaint to the Office of Human Resources (OHR).

(h) Such counseling as her doctor feels necessary in relation to the grievances, this to be charged to administrative leave,

(i) "Identification of a method by which to restore my character within" the agency. (Emphasis added.)

It developed that the complaint by Ms. Kidd was not seen by Captain Lambert. In the regular course of business, such complaints were handled by the Equal Employment Opportunity Officer in the Agency.

On September 1, 1988, however, Ms. Kidd then filed a complaint with another agency, the OHR, in which, after all those written complaints over a long period of time, she charged for the first time that Mr. Carter, her Supervisor, had coerced her to have sex with him many months previously. Thus, her complaint now took a giant leap and went from one describing office frictions and personality clashes accompanied by charges of office mismanagement to a charge of coerced sex and sexual abuse twice by Mr. Carter a long time ago. Mr. Parks thereupon was dropped as an object of her complaints and became no part of this proceeding; and, as I related earlier, Mr. Carter, against whom the sexual charge was made, is not a party to this appeal. Instead, the charge here is that Mr. King, who was Mr. Carter's Supervisor and the Associate Director, Real Property Administration, and Captain Lambert, who was, as I stated earlier, Director of the Department of Administrative Services for the District of Columbia Government, intentionally inflicted emotional distress upon her. In other words, this appeal involves officials in the higher echelons of government who, as far as the record discloses, did not even know Ms. Kidd at the time of her lurid sexual relationship with Carter. But both are charged here with intentional infliction of emotional distress on her.

We approach now the crucial area, factually, in the majority opinion. The majority judges argue that during a time Ms. Kidd was on leave, there was a clandestine arrangement by Ms. Kidd's superiors to transfer her to a different division. To examine this contention of the majority, we must turn to the testimony adduced by Ms. Kidd which relates to her transfer. The only witness presented by Ms. Kidd who had knowledge of how her transfer came about was Mr. Cheers, her new supervisor. The testimony of her own authoritative witness, Mr. Cheers, refutes the argument made by the majority judges on the matter of the transfer.

Mr. Cheers testified that

[o]n one occasion in July of 1988 as I talked with Mr. Carter, he informed me that he was having some difficulty working with and relating to Ms. Kidd, who was his employee. He told me that she wasn't working out, that they weren't getting along.

So I, I knew that Ms. Kidd had prepared a data processing program.... And so as Mr. Carter talked to me about his having problem [sic] with her, at that point I knew I needed data processing to help me manage the personnel property for the department and the District, so I suggested to Mr. Carter that he transfer Ms. Kidd and her position number from real property administration to my division within the procurement management.

Q. Now, after you spoke to Mr. Carter did you take any action with respect to transferring Ms. Kidd?

A. Yes. After talking to Mr. Carter perhaps twice, I then went to Ms. Kidd and let her know what I was *proposing* and what I was *proposing* was that she come to work for me as a personnel management ... specialist.

Q. Now, when was it that you approached Ms. Kidd about coming to work for you?

A. After my conversation with Mr. Carter about perhaps having her come to work for me, *before I did anything official I wanted to chat with her.*

\* \* \* \* \* \*

I went to her and I told her that I needed someone in my organization to create a program for our computer that we had that would manage the property and since she had done a good job with the space management I thought that she would be able to help me. And I *asked* her if she would be willing to transfer from

real property administration to my division.

Q. And what did she tell you?

A. She told me that, *yes, she would like to do that.*

(Emphasis added.)

As we see, the testimony of Ms. Kidd's crucial witness on her transfer (Mr. Cheers) explodes the argument being made by the majority judges about the conspiratorial arrangement leading up to it. Her witness Cheers who was her only witness who knew of how it came about (and he was not impeached) established the simple truth that the transfer was his idea and she was in favor of it. So much for that particular "collusion" ("locked out of her office," etc.).

We are now at the critical point, according to the majority, where Ms. Kidd's new position with Mr. Cheers became a 120–day detail. This occurred after she had filed the sexual harassment complaint at OHR against Mr. Carter; and, argues the majority, this is where the most important "collusion" and "retaliation" took place, these being ascribed to appellant King. Let's examine the facts relating to this.

Ms. Kidd had filed her complaint with OHR on September 1, 1988.[11] In support of her position in the trial court that appellant King, and others, e.g., Captain Lambert and Mr. Carter, had retaliated against her by bringing about a change in her position from a reassignment to a 120–day detail, Ms. Kidd placed in evidence a document (Exhibit 20). It was a memorandum dated September 14, 1988 to Mr. Gordon (Mr. Cheers' boss) from Ms. Britton, Associate Director for Finance and Administration on the subject "Detail of Patricia A. Kidd." It stated:

Pursuant to a telephone conversation with Robert King, attached is a copy of the SF–52 to detail Ms. Kidd from RPA to MMA, for a period not-to-exceed 120 days.

During this period of time, MMA should identify a permanent position number to effect the reassignment of Ms. Kidd. Once this is accomplished, MMA should prepare the appropriate SF–52, indicating "reassignment" under Block A(.) "Kind of Action Requested".

*We need to process the required personnel action as soon as possible.*

(Emphasis supplied.)

This document, introduced by Ms. Kidd, establishes that the "detail" arrangement came about after a conversation between appellant King and the personnel chief two weeks after Ms. Kidd filed her unsuccessful sexual harassment complaint with OHR. The memorandum stipulates that her new division should identify "a permanent position number *to effect the reassignment of Ms. Kidd*" and that, once this is done, her new division should prepare the appropriate form indicating her "reassignment." (Emphasis added.) Then the memorandum is terminated by an indication of urgency to effect the "reassignment" (terminating the "detail") by stating, "We need to process the required personnel action as soon as possible."

This does not seem "retaliatory." A reasonable jury could not so conclude, unless words have lost their meaning.

Ms. Kidd's witness, her former supervisor, Mr. Cheers, testified concerning the significance of "position numbers." He explained the complication of "position numbers" as they relate to reassignments. He said that under personnel regulations in order to increase staff it is necessary to have the position number as well, and that positions and position numbers affect budget plans for a given year. Cheers said that his arrangement with Carter was that as soon as he had a position number that became vacant he would transfer that position number back to

---

11. It is of incidental interest to note that the Office of Human Resources of the District Government, to which she had made her charge of sexual harassment by Mr. Carter, ruled that she had not supplied probable cause to support her charge. Having lost there, Ms. Kidd then appealed the decision of the Office of Human Resources to the City Administrator. The City Administrator upheld the decision of the Office of

Human Resources. Having been unsuccessful in the statutorily provided administrative process, Ms. Kidd next turned to the courts. She filed a complaint in this proceeding and, after a jury trial, judgment was entered in her favor against Mr. Carter (who, as stated, is not a party on this appeal) and judgments were entered against appellants King and Lambert on a charge of intentional infliction of emotional distress on her.

the Real Property Administration (Carter). Cheers stated that when he accepted Ms. Kidd and her position number he did not have a position number to give back to Carter (Real Property Division); and, furthermore, during all the time Ms. Kidd was in his division he never had a position number to give back to Mr. Carter. This, he said, had the practical effect that Mr. Carter was going to lose a position number and, therefore, a body in his section.

This raised complications between the two divisions as the original understanding was not being implemented.

The majority relates emotional scenes by Carter during meetings to unravel these problems on Ms. Kidd's transfer and sets forth manifestations of ill-will by Mr. Carter toward Ms. Kidd, who had filed the sexual harassment complaint against him.[12] To demonstrate the "collusion" between King and Carter and the "retaliation" by Carter and King against Kidd, the majority relates that at a meeting Carter wanted Cheers to obtain a memo stating the circumstances of her transfer. This transfer, of course, was at the request of Cheers, as he had testified. At a later meeting, Cheers said there was a request for Ms. Kidd to sign a memo saying she "agreed to or wanted to be transferred to [Cheers'] division," this being the actual fact, as Cheers had so testified. Yet, the majority argues strenuously that these incidents establish its conspiracy theory.

The majority judges contend that all this establishes "collusion" among her superiors, including her supervisor, appellant King, and a "retaliation" against her because she had filed a complaint against Mr. Carter with the OHR charging sexual harassment. When these unassailable facts established in the trial are reviewed in the way we are legally required to examine them, the conclusion of the majority is unreasonable as a matter of law.

But this is not all, says the majority. After she was transferred back to the Real Property Division, subsequent to a conference with Mr. Gordon (Cheers's boss), she did not receive a grade raise until December, 1989. This was months after she was legally eligible to receive it, complains the majority.[13]

All this, they say, establishes that appellant King *intentionally inflicted* emotional distress on Ms. Kidd, as she suffered such distress as a result. But this conclusion is clearly contrary to the law on intentional infliction of emotional distress as established by our decisions, as will now be explained. It is a mystery in this case that the majority carefully avoids an analytical discussion of our decisions on this charge in order to demonstrate that their opinion here accords with the law this court has created. There must be a reason. *See, e.g., Thompson I,* for starters.

### III.

In order to get to the jury as a matter of law on this charge, a plaintiff must present conduct that is so extreme and outrageous that it "goes beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized society." *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980), quoting RESTATEMENT (SECOND) OF TORTS § 47 comment d (1946).[14]

Ms. Kidd's witness, Cheers, who was her one witness able to testify from beginning to end regarding the circumstances of her transfer to his section and later back again to King's division, did not testify to any occurrences amounting to outrageous conduct which could reasonably be construed as intending to inflict emotional harm on Ms. Kidd. *See, e.g., Waldon v. Covington, supra,*

---

12. The majority charges that Ms. Kidd returned from leave to find herself "locked out of her office." In the next sentence, however, it becomes evident that while on leave her transfer had become effected.

13. It is doubtful that government employees necessarily receive grade raises at the point they are legally eligible for it.

14. The majority favors us with an inspiring and scholarly exposition relating to Title VII and sexual harassment. Yet, there are no legal issues on Title VII or sexual harassment in this appeal. The charge is intentional infliction of emotional distress.

and *District of Columbia v. Thompson (Thompson I), supra.*

Her initial written grievances amounted to complaints of office friction with the secretary, the acting supervisor (a Mr. Parks), and her supervisor, Mr. Carter. In essence, these grievances to appellants King and Lambert amounted to complaints of poor administration by her supervisor, personality conflicts with her sometime acting supervisor, and a grudge against the office secretary for back-talking her. Office complaints such as those she made are not unknown to experienced executives.

Even if one were to accept the majority's theory concerning a delay beyond the date of her legal eligibility for it, in reaching her Grade 11, the evidence still does not approach, *as a matter of law,* an intentional infliction of emotional harm on Ms. Kidd by appellant King. At the most, her promotion to Grade 11 was delayed.

In *Thompson I, supra,* 570 A.2d at 290, we said that a defendant-supervisor's conduct of criticizing plaintiff-employee in over twenty memoranda, approving employee's leave and then changing that status to absence without leave, refusing to consider employee for promotion to next grade level or not allowing employee to take a computer test that employee had requested, isolating employee from other employees, *employee's ultimate discharge, pushing employee against the wall* and pointing of finger, *coupled with threatening words* was *not* "sufficiently egregious under the applicable standard" for intentional infliction of emotional distress.

In *Waldon v. Covington, supra,* 415 A.2d at 1077–78, we held that a supervisor who refused to give a professor who was employed at the university the keys to a laboratory, failed to give him adequate notice of departmental meetings, *threatened to initiate action to determine his competency "with an eye to terminating his employment"* and assigned the professor to teach classes outside of his specialty knowing it would cause him embarrassment and difficulty, did not constitute intentional tort liability. (Emphasis added.) *See also Schoen v. Consumers United Group, Inc.,* 670 F.Supp. 367, 379 (D.D.C.1986) (plaintiff-employee's claim of in-

tentional infliction of emotional distress for dismissal without prior disciplinary procedures, breach of confidentiality, "an unbroken string of humiliations and *attempts to force Plaintiff [] to resign* ... simply do not satisfy the standard for liability") (emphasis added); *Shewmaker v. Minchew,* 504 F.Supp. 156, 159, 163 (D.D.C.1980) (supervisor's alleged wrongful reassignment of employee *which amounted to employee's termination from his position, supervisor's repeated attacks on his character* to other agencies as well as to the news media, supervisor's efforts to block a hearing after his termination because "harassment in a professional context, including exclusion from business meetings and the spreading of unfavorable rumors, is not the type of conduct that gives rise to such a cause of action"), *aff'd,* 215 U.S.App.D.C. 53, 666 F.2d 616 (D.C.Cir. 1981); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 493–94, 340 S.E.2d 116, 122–23 (1986) (cited in *Thompson I* ) (supervisor's interference with employee's supervision of subordinates, screaming and shouting at her, calling her names, throwing menus at her and *firing her* was not extreme and outrageous conduct). *See generally Bradley v. Consolidated Edison Co. of N.Y.,* 657 F.Supp. 197 (S.D.N.Y.1987) (continual negative evaluations, harassment, and disparaging statements was not extreme and outrageous conduct); *Price v. Federal Express Corp.,* 660 F.Supp. 1388 (D.Colo.1987) (allegations that employer subjected employee to harassment, coerced him to accept a lateral transfer, and constructively discharged him in retaliation for participating in another employee's race discrimination suit, failed to state a claim for infliction of emotional distress); *Byrnes v. Orkin Exterminating Co.,* 562 F.Supp. 892 (E.D.La.1983) (five incidents of cursing at employee, taking over his sales presentations, and otherwise embarrassing him in presence of others not sufficiently continuous or prolonged to constitute outrageous conduct); *Wells v. Thomas,* 569 F.Supp. 426 (E.D.Pa.1983) (demoting employee and taking away private office and secretary, giving poor performance ratings, and failing to give annual salary increase do not constitute outrageous conduct); *Jackson*

*v. Colonial Baking Co.*, 507 So.2d 1310 (Ala. 1987) (reducing work schedule of employee with respiratory disability because he refused to climb a ladder and clean exhaust fans was insufficient to constitute outrageous conduct); *Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72 (1987) (no outrageous conduct where, after employee was acquitted of sexual assault charges by another employee, employer moved the employee's desk into a hallway, gave him no meaningful work, and supervisors would not talk to him).

Situations where the courts have found that sexual harassment by an employer, including unwelcome sexual advances, inferior work assignments, and failure to investigate complaints, constitutes outrageous conduct are instructive in comparison with the actions ascribed to appellant King. *See Pratt v. Brown Machine Co.*, 855 F.2d 1225 (6th Cir. 1988) (employer required employee in dire financial need to attend church and pray and apologize to company official in spite of fact that official had subjected employee's wife to 18 months of threatening and obscene phone calls); *Pavilon v. Kaferly*, 204 Ill.App.3d 235, 149 Ill.Dec. 549, 561 N.E.2d 1245 (1990) (employer's requests for dates and sexual favors, alleged threats to kill and rape plaintiff, and unsolicited letters to plaintiff's parents and psychotherapist were sufficient basis for intentional infliction claim); *Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170, 1184 (1989) (where Court stated "it could visualize no conduct more outrageous ... than to vent highly radioactive steam upon another"); *Engrum v. Boise Southern Co.*, 527 So.2d 362 (La.App. 3d Cir.1988) (plaintiff stated claim where he alleged that employer repeatedly publicly threatened him, that he was fired without adequate investigation, and that paycheck was issued to him in manner which led to his arrest); *Kaminski v. United Parcel Service*, 120 A.D.2d 409, 501 N.Y.S.2d 871 (1986) (an employee who was threatened with prosecution and kept in a room for three hours until he signed a confession and resignation papers successfully stated a claim for intentional infliction of emotional distress); *but see Aquino v. Sommer Maid Creamery, Inc.*, 657 F.Supp. 208 (E.D.Pa.1987) (employee's allegations that her work was scrutinized closer than other employees, that a co-worker followed her to the restroom, banged on the door and asked what she was doing, and that president of employer stared at her, called her at home to demand she report to work and berated her for low work production, were insufficient to support intentional infliction claim); *Lewis v. Oregon Beauty Supply Co.*, 302 Or. 616, 733 P.2d 430 (1987) (allegation that employer failed to respond to sex harassment complaints was insufficient to state emotional distress claim); *Ponton v. Scarfone*, 468 So.2d 1009 (Fla.Dist.Ct.App.), *rev. denied*, 478 So.2d 54 (Fla.1985) (employer's attempts to convince female employee to have sex did not constitute outrageous conduct).

The majority opinion, after attributing all manner of "collusion," and "retaliation" by the higher officials in the agency, finally tells us what it considers the heart of the case it weaves against King. They conclude:

> Thus, the jury could find that Kidd suffered more than a delayed promotion; there was also severe emotional distress resulting from the same cause: King's collusion with Carter in pressuring Kidd to help Carter defend against Kidd's own OHR complaint.

*Ante* at 679.

There, we have it. This is the statement of the majority judges on what this case is all about. Ms. Kidd was (1) delayed beyond her eligibility date in receiving her promotion and (2) there was also severe emotional distress resulting from the same cause: King's collusion with Carter in pressuring Kidd to help Carter defend against Kidd's own OHR complaint. Fundamentally, this is where the majority opinion and the dissent differ on the law.

Strikingly, the majority does not deal with this court's opinions because *Thompson I*, for example, and this opinion cannot be reconciled.

Secondly, the majority is there ascribing "collusion" on the part of King because he engaged in "pressuring" Kidd "to help Carter defend against Kidd's own OHR complaint." There was an effort to get her to put in writing, to aid Carter, the circumstances relating to her transfer. Yet all her

own evidence established the transfer was agreeable to her; and in fact she had repeatedly requested in writing (in her several grievances) that she be reassigned.

It is evident that, under our decisions, and viewing the evidence in a light most favorable to the plaintiff, as a matter of law, as established by our decisions, this case should not have been submitted to the jury, and the trial court erred in doing so. I agree with the majority that the trial court clearly erred in submitting the case on appellant Lambert to the jury. But I think it also erred as to appellant King.[15]

I believe this decision creates a disturbing new precedent for the workplace, and that it will have wide reverberations.

### ATTACHMENT

### APPENDIX TO DISSENT:

Reproduction of barely legible trial court exhibit entitled "Formal Grievance", dated May 18, 1988.

15. Appendix comprised of Ms. Kidd's complaint to appellant King is attached to this opinion.

## APPENDIX

TO : MR. ROBERT KING DEPARTMENT OF ADMINSTRATIVE SERVICES
 ASSOCIATE DIRECTOR
 REAL PROPERTY ADMINISTRATION 19 MAY 88

FROM : MS. PAT KIDD
 REAL PROPERTY UTILIZATION SPECIALIST
 REAL PROPERTY ADMINISTRATION

SUBJECT : FORMAL GRIEVANCE

A. IN ACCORDANCE WITH THE PROVISIONS OF TITLE XVI OF DC LAW 2-139, AND HAVING FULFILLED THE REQUIREMENTS OF THE INFORMAL GRIEVANCE PROCEDURES, I AM RESPECTFULLY FILING A FORMAL GRIEVANCE FOR YOUR REVIEW AND DECISION.

B. MY FORMAL GRIEVANCE IS BASED ON THE FOLLOWING:

1. FROM ONE DAY TO THE NEXT, I DON'T KNOW WHO I'M SUPPOSED TO BE SUPERVISED BY - WHETHER IT'S MR. CARTER, CHIEF, SPACE UTILIZATION DIVISION (SUD) OR MR. PARKS, SPACE SPECIALIST, SUD. MR. CARTER REPEATEDLY TELLS ME MR. PARKS IS NOT IN MY SUPERVISORY CHAIN, THEN HE TELLS ME THAT I'M TO TAKE ORDERS FROM MR. PARKS. PRIOR TO FILING MY INFORMAL GRIEVANCE AND THEREAFTER, DUE TO INCONSISTENCIES IN WORK DIRECTION, I HAVE REPEATEDLY REQUESTED THAT MR. CARTER FORMALLY STATE WHAT MR. PARKS' SUPERVISORY POSITION IS WITHIN THE DIVISION. HIS STATEMENTS WERE : "MR. PARKS WORKS IN DESIGN, YOU WORK WITH DATA AND THE COMPUTER AND YOU BOTH WORK AND REPORT DIRECTLY TO ME." OTHER TIMES HE SAYS, "MR. PARKS GIVES INSTRUCTIONS FOR ME". UP UNTIL THE DAY I REQUESTED FROM HIM TO BE ALLOWED TO GO FORMAL WITH MY GRIEVANCE, MR. CARTER HAS BEEN UNWILLING TO ADDRESS FORMALLY TO WHOM OTHER OFFICE MEMBERS AND I ARE TO REPORT.

2. I AM GIVEN ASSIGNMENTS BY MR. PARKS - THE ASSIGNMENTS ARE MANY TIMES CONTRADICTORY TO PRIOR TRAINING/INSTRUCTIONS ISSUED BY MR. CARTER. WHEN I BRING THIS TO MR. CARTER'S ATTENTION FOR CLARITY/CONFIRMATION HE INSISTS THAT I FOLLOW THROUGH ANYWAY. MANY TIMES, THEREAFTER, I'M REPRIMANDED BY MR. CARTER FOR FOLLOWING THROUGH ON WORK ASSIGNMENTS OR ACTION GIVEN BY MR. PARKS WHICH MR. CARTER FEELS ARE/WERE INAPPROPRIATE OR INCORRECT. MR. PARKS HAS NEVER COMEFORTH TO TELL MR. CARTER THAT HE HAD GIVEN MISDIRECTION TO THE STAFF EVEN AFTER I HAVE ASKED HIM TO DURING MR. CARTER'S REPRIMANDS IN MEETINGS. IT APPEARS TO ME THAT THE "RIGHT HAND DOESN'T KNOW WHAT THE LEFT HAND IS DOING".

3. MR. CARTER OFTENTIME LEAVES IT UP TO MR. PARKS TO RELAY MATTERS TO THE STAFF. I AM NOT KEPT ABREAST OF IMPORTANT DETAILS OF WORK OR EVENTS OF INTERESTS. (EX. TRAINING COMES UP - I'M EITHER NOT INFORMED OR INFORMED THE EVENING PRIOR TO THE ONSET OF TRAINING, NOT INFORMED WHEN SUPPLIES ARE BEING ORDERED, NOT BEING INFORMED ON AGENDA'S OF MEETINGS - OFTENTIMES I AM TOLD TO FOLLOW OR JUST WALK INTO A MEETING, NOT INFORMED ON MAJOR CHANGES IMPACTING OUR OPERATIONS. THERE HAVE BEEN OCCASIONS WHEN CARTER HAS PERSONALLY RECOGNIZED INPUT THAT I BROUGHT THAT

PAGE 2

MR. PARKS' ATTENTION.

4. MR. CARTER HAS ORDERED ME TO CURTAIL MY MEETINGS AND INTERACTIONS WITH DEPARTMENTAL EMPLOYEES AND PEOPLE WHO SERVE AS AN INFORMATION SOURCE FOR ME. IN SOME CASES HE HAS GONE TO INDIVIDUALS AND ORDERED THEM TO SAY CLEAR OF ME AND MY WORK.

5. HE REBUFFS MY REQUESTS FOR TRAINING BUT STILL EXPECTS FOR ME TO PERFORM THE MOST TECHNICAL ASPECTS OF COMPUTER OPERATIONS.

6. HE CONSTANTLY BELITTLES THE WORK DONE VIA THE COMPUTER PROCESS AS BEING TIME CONSUMING, NOT NECESSARY, AN OBSTACLE AND NOT A NECESSARY REQUIREMENT WITHIN SUD, FEELS THAT DATA CAN BE BETTER MAINTAINED ON THE CPT. THIS PREJUDICE MAKES THIS PORTION OF MY JOB EXTREMELY STRESSFUL MORE DIFFICULT THEN NEED BE AND HINDERS NECESSARY SUPPORT IN GETTING THE JOB DONE.

7. HE ACCUSES ME OF BEING OBSESSED AND SPENDING TOO MUCH TIME ON THE COMPUTER WHEN I SHOULD BE DEALING WITH SPACE. THIS HAPPENS EVEN THOUGH HE HAS ORDERED ME TO WORK EXCLUSIVELY INPUTTING DATA INTO THE SYSTEM AND WORK ON NOTHING ELSE.

8. HE REPRIMANDED ME FOR BUILDING A DATABASE (AKA: AIMS-P AN AUTOMATED SYSTEM COMPRISING AGENCY SPACE AND LOCATION INFORMATION EVEN THOUGH THIS SYSTEM HAS BEEN BADLY NEEDED) AND ENTERING INFORMATION WITHOUT HIS APPROVAL. THIS DATABASE WAS DESIGNED, BUILT AND DATA INPUTTED ON MY OWN PERSONAL TIME AND PRESENTED TO HIM AS A PACKAGE PRESENTATION.

9. ALL MY REQUESTS FOR OVERTIME (OT)/COMPENSATORY TIME WERE DENIED UNTIL THE RPA ADMINISTRATOR, REQUESTED THAT SOMEONE BE DESIGNATED TO WORK OT TO INPUT DATA FOR THE MAYOR'S JUNE PRESENTATION.

10. UPON THE FREEZE, OT CEASED. I WAS REPRIMANDED FOR SUGGESTING MY WILLINGNESS TO ACCEPT COMPENSATORY TIME IN LIEU OF OT FOR THE SAKE OF INPUTTING DATA REQUIRED FOR THE JUNE PRESENTATION AND WAS TOLD NOT TO MAKE A SUGGESTION LIKE THIS AGAIN AS IT IS TOTALLY INAPPROPRIATE. ALL WORK WAS INPUTTED INTO THE CPT BY THE SECRETARY OR CLERICAL ASSISTANT FOR THE FOLLOWING 2 WEEKS NO WORK WAS GIVEN TO ME TO INPUT INTO THE COMPUTER SYSTEM UNTIL I TOOK THE LIBERTY OF XEROXING A PACKAGE HE HAD GIVEN TO THE SECRETARY, I STARTED INPUTTING THE DATA FOR THE SAKE OF SAVING TIME. HE ASKED ME HOW DID I GET A COPY, I INFORMED HIM I TOOK IT FROM HIS OFFICE AND STATED THAT WE WERE WASTING VALUABLE TIME.

11. THERE IS CONSTANT YELLING, CURSING, THREATS, REPRIMANDS AND CHEWING-OUTS OF THE ENTIRE STAFF BECAUSE OF ONE OR 2 PERSON ACTIONS.

12. ON AT LEAST 3 OCCASIONS AFTER ATTEMPTING TO EXPRESS MY CONCERN FOR WITH INCONSISTE OFFICE POLICIES, HARRASSMENTS,

PAGE 3

UNFAIR PRACTICES AND HIS METHODS OF HANDLING THE AFOREMENTIONED WHICH ARE NEVER RESOLVED HE TELLS ME "IF YOU DON'T LIKE THE WAY I RUN MY OFFICE, FIND ANOTHER JOB" OR HE THREATENS TO TRANSFER ME TO EPA WHERE HE INSISTS THAT I WILL REALLY HAVE PROBLEMS.

13. FROM SEPT 87 THROUGH MAY 1988 I HAVE BEEN INFORMALLY DESIGNATED AS SUPERVISOR OF MS. DARCEL HENDERSON ON AT LEAST 4 OCCASIONS. MR. CARTER BECOMES UPSET OR AFTER COMPLAINTS FROM MR. PARKS SUPERVISORY CONTROLS OF MS. HENDERSON HAVE BEEN INFORMALLY TRANSFERRED TO THE SECRETARY, MR. CARTER, MR. PARKS AND ANYONE WHO NEEDS MS. HENDERSON PER MR. CARTER INSTRUCTIONS. AS OF OUR ALTERCATION ON 18 MAY 88, MR. CARTER HAS AGAIN NULLIFIED MY SUPREVISORY CONTROL OF MS. HENDERSON AND RETURNED THEM TO MR. PARKS. THIS MAKES FOR A VERY DISRUPTIVE WORK ENVIRONMENT AND HAS BEEN STRESSFUL TO ME AS WELL AS MS. HENDERSON WHO RARELY KNOWS WHAT IS EXPECTED OF HER. IN AN EFFORT TO CORRECT THIS PROBLEM, WHILE MS. HENDERSON WAS UNDER MY INFORMAL SUPERVISORY CONTROL, I ATTEMPTED TO FORMALLY ASSIGN HER TO A SET OF DUTIES BY PROVIDING HER DUTIES IN WRITING. MR. PARKS QUESTIONED MS. HENDERSON AND BROUGHT THIS TO MR. CARTER'S ATTENTION, I WAS REPRIMANDED AND THE DUTIES WERE RESCINDED.

14. PERTAINING TO UNDERUTILIZATION OF MS. HENDERSON, ALL WORK AND (TRAINING TIME) I HAVE GIVEN MS. HENDERSON HAS BEEN EITHER RESCINDED, INTERRUPTED OR SUPERSEDED BY MESSRS. CARTER OR PARKS FOR THE PURPOSE OF TYPING OR JUST CARRYING MS. HENDERSON WITH THEM WITH NO NOTIFICATION TO ME AS HER SUPERVISOR. THIS HAS BEEN REPEATEDLY DISCUSSED WITH MR. CARTER TO NO AVAIL. (PROBLEMS OF THIS NATURE LEAD TO THE INCIDENT OF 18 MAY 88—SEE ATTACHMENT).

15. IT APPEARS THAT WHEN THE SECRETARY IS GIVING THE STAFF PROBLEMS OR DOESN'T WANT TO WORK MS. HENDERSON BECOMES THE ONE WHO MUST DO THE TYPING FOR HER. OFTENTIMES, THE SECRETARY IS AT HER DESK READING A NEWSPAPER OR MAGAZINE, WHEN MS. HENDERSON IS REQUESTED TO PERFORM THE SECRETARIAL FUNCTIONS. THIS INTERFERS WITH MY PRODUCTIVE PLANNING AS I COULDN'T RELY ON MS. HENDERSON'S ASSISTANCE OR I WOULDN'T KNOW WHEN MESSRS. CARTER OR PARKS NO LONGER REQUIRED HER ASSISTANCE.

16. SINCE I HAVE BEEN IN THIS DIVISION, THE SECRETARY SABOTAGES MY WORK. SHE HAS BEEN REPRIMANDED BY MR. CARTER FOR THROWING MY WORK ON THE FLOOR AND THROWING MY WORK AWAY. WHEN HE ASKED HER WHY, SHE ACKNOWLEDGED, "YES I DID, YOU KNOW HOW IT IS MEL, I WAS HAVING A BAD DAY". ALTHOUGH HE HAS REPRIMANDED HER, HOWEVER, AS OF 18 MAY 88 I STILL HAVE PROBLEMS WITH GETTING MY TYPING BACK IN A TIMELY MANNER. REQUESTED DRAFTS AND FINALS ARE EITHER LOST, DISCARDED OR RETURNED WITHIN 1 TO 2 WEEKS, (EXAMPLE ATTACHED). THIS HAS BEEN DISCUSSED WITH MR. CARTER ON NUMEROUS OCCASIONS, HE SUGGESTS THAT I BRING IT TO HIS ATTENTION AS IT HAPPENS. WHEN I DID IT STILL CONTINUED, EVENTUALLY I WAS REPRIMANDED.

17. WHILE REQUESTING XEROXING AND SPLICING ASSISTANCE FROM THE

PAGE 4

SECRETARY SHE ASKED ME WHAT I WAS DOING AND REFUSED TO ASSIST ME. IN DISCUSSING THIS WITH MR. CARTER HE STATED, "TO SAVE CONFUSION, DO YOUR OWN XEROXING. I DO MY OWN, EVERYBODY DOES THEIR OWN. YOU ARE PERSONALLY RESPONSIBLE FOR YOUR OWN PROJECTS - FROM BEGINNING TO END".

18. I SUBMITTED MY OT HOURS TO THE SECRETARY WHO SERVES AS TIMEKEEPER. SHE INSTRUCTED ME THAT I NEEDED AN OT FORM BUT REFUSED TO OBTAIN A FORM OR FILL IT OUT. THIS TOO WAS DISCUSSED WITH MR. CARTER, HE SUGGESTED THAT I GO TO THE PERSONNEL OFFICE TO OBTAIN A FORM AND TOLD ME I WAS RESPONSIBLE FOR COMPLETING MY OWN FORM.

19. I NEEDED SOME SUPPLIES AND THE SECRETARY IGNORED MY REQUEST. THIS WAS DISCUSSED WITH MR. CARTER. HE SUGGESTED THAT I COMPLETE MY OWN REQUISITIONS FOR SUPPLIES.

20. AFTER SEVERAL LIKE INCIDENCES OF REQUESTING SECRETARIAL AND CLERICAL SUPPORT, I ASKED MR. CARTER WHAT WERE HER DUTIES. HE STATED "IT'S NONE OF YOUR BUSINESS WHAT HER DUTIES ARE. SHE IS MY PERSONAL SECRETARY." WHEN I ASKED HOW DOES THE DIVISION OBTAIN SUPPORT HE STATED "SHE PERFORMS ALL CLERICAL DUTIES, BUT YOU DO YOUR OWN XEROXING AND STUFF.'

21. I WAS ALSO REPRIMANDED FOR IMPLELMENTING A SYSTEM TO DOCUMENT WHAT TYPING I GAVE HER AND HOW LONG IT TOOK TO GET IT BACK. MR. CARTER REPRIMANDED ME FOR THIS STATING ONLY HE CAN SET DEADLINES FOR WORK IN THE OFFICE.

22. I HAVE BEEN CURSED BY THE SECRETARY AND CALLED 'PRISSY MISS MISSY'.

23. TELEPHONE CALLERS ARE ABUSED, UNPROFESSIONALLY HANDLED AND MESSAGES ARE NOT LEFT BY THE SECRETARY. ALL OF THIS HAS BEEN DISCUSSED WITH MR. CARTER. THE RESULTS WERE (1) HE CALLED A MEETING AND REPRIMANDED THE WHOLE STAFF AND STATED "I DON'T WANT TO HEAR THIRD PARTY COMPLAINTS, IF A CALLER FEELS HE IS RUDELY TREATED REFER THEM TO ME PERSONALLY", AND, (2) THE PROBLEMS PERSIST.

23. FOR THE SAKE OF EXCLUDING REDUNDANCY, PLEASE REFER TO OTHER GRIEVABLE ITEMS ADDRESSED IN MY INFORMAL GRIEVANCE MEMORANDUM TO MR. CARTER, SUBJECT: HARASSMENT IN THE OFFICE. ITEMS INCLUDED IN THE (ATTACHED) INFORMAL GRIEVANCE SHOULD BE CONSIDERED AS PART OF THIS FORMAL GRIEVANCE AS THEY WERE NEVER RESOLVED OR ADDRESSED BUT ALLOWED TO CONTINUE AND BECOME VOLCANIC.

C. ON THE BASIS OF THE ABOVE AND ATTACHED INFORMATION, I AM ASKING FOR THE FOLLOWING RELIEF:

1. THAT MY SUPERVISOR (MR. CARTER), RESCIND THE LETTER OF MISCONDUCT BECAUSE

PAGE 5

a. FOR THE REASONS STATED ABOVE IT, THE LETTER OF MISCONDUCT IS UNFAIR, DEFINITELY UNWARRANTED AND UNTRUE. AFTER MONTHS OF BEING YELLED AT, TOLD TO FIND ANOTHER JOB, THE INCONSISTENCY IN SUPERVISORY CONTROLS, STAFF MISMANAGEMENT AND HIS REFUSAL TO FORMALLY (INWRITING) WHETHER MR. PARKS WAS TO HAVE SUPERVISORY DIRECTIONS, (THE WEEK OF 15 MAY WAS EXCEPTIONALLY STRESSFUL) AND OUT OF MONTHS OF STRESS, HARRASSMENT AND MISTREATMENT, I, OUT OF BUILT-UP FRUSTRATION, FEELING SICK AND A SENSE OF HELPLESSNESS, YELLED BACK.

b. AS STATED IN MY REBUTTAL MEMORANDUM TO MR. CARTER (WRITTEN 18 MAY 88 - COPY ATTACHED), RESPECT IS TWO WAYS AND SUPERVISORS SHOULD NOT BE ALLOWED TO USE THEIR TITLE TO CONSTRICT, HARNESS AND ABUSE SUBORDINATES' EMPLOYEE RIGHTS AND HUMAN RIGHTS.

c. MY CHARACTER SPEAKS FOR ITSELF, I AM A TEAM PLAYER, HARD WORKER, SELF DRIVEN AND MOTIVATED EMPLOYEE WHO DOESN'T MIND GOING THE EXTRA MILE TO GET THE JOB DONE. FOR THE RECORD IT IS NOT THAT I DON'T LIKE THE SECRETARY BUT INSTEAD I HAVE FALLEN VICTIM TO SOMEONE WHO THE SUPERVISOR HIMSELF STATES SHE IS NOTORIOUSLY KNOWN FOR HER BAD ATTITUDE, NOT BEING COOPERATIVE OR DEPENDABLE AND HAS A HISTORY OF IMPEDING MY WORK VIA SABOTAGE AND HAS BEEN REPRIMANDED BY MR. CARTER FOR SUCH. I FEEL THAT IT'S A 'COP-OUT' ON MR. CARTER'S PART TO MAKE ME THE VILLAIN RATHER THEN TO DEAL WITH THE REAL PROBLEM.

d. IT IS MY BELIEF THAT OTHER PROBLEMS IN THE OFFICE.ARE A RESULT OF CONFUSION IN WHO SUPERVISES WHO, HOW AND WHEN. THIS IS A DIVISION PROBLEM NOT JUST FOR ME. ALSO, LACK OF COMMUNICATION AND COORDINATION BETWEEN MESSRS. CARTER AND PARKS MAKES IT DIFFICULT TO KNOW WHAT IS REQUIRED, WHAT IS NEEDED TO BE DONE AND WHAT TOOLS ARE PERMISSIBLE TO USE BY STAFF IN ORDER TO GET THE JOB DONE.

**1. REQUEST THAT I BE REASSIGNED IMMEDIATELY TO A POSITION WITH NON-COMPETITIVE PROMOTIONAL OPPORTUNITY LIKE IN MY PRESENT POSITION BECAUSE;**

a. JUDGING FROM PAST HISTORY AND MR. CARTER'S ACTION OF 1-8 MAY 88, I NO LONGER HAVE THE CONFIDENCE THAT MR. CARTER CAN OR IS CAPABLE OF BEING FAIR, FORCEFUL AND RESOURCEFUL IN RESOLVING OFFICE PROBLEMS IN A EQUITABLE AND NON-BIAS MANNER.

b. I FEAR FOR REPRAISALS OR RETALIATORY ACTIONS AGAINST ME.

c. DUE TO HEALTH REASONS (PEPTIC ULCER) I CAN NOT TOLERATE ANY FURTHER UNDUE STRESS AND HARRASSMENT OR UNFAIR TREATMENTS.

d. I FEEL STAGNATED AND TRAPPED NOT BEING ABLE TO NETWORK AND HAVE THE FREEDOM TO INTERACT WITH OTHER DEPARTMENTAL/GOVERN- MENTAL EMPLOYEES FOR THE PURPOSE OF SHARING, SOLICITING RESOURCES

PAGE 5

OR FOR RECREATIONAL PURPOSES.

3. THAT I RECEIVE AN EXCELLENT PERFORMANCE EVALUATION BASED ON BY CONTRIBUTIONS TO THE DIVISION, ADMINISTRATIONS, DEPARTMENT AND THIS GOVERNMENT, FOR MY FIRST YEAR OF DISTRICT SERVICE (MY ANNIVERSARY DATE IS 21 JUNE 88) BECAUSE:

a. I DESIGNED, PLANNED, DEVELOPED AND IMPLEMENTED THE AIMS-P ON PERSONAL TIME. THIS WAS NOT CONSIDERED PART OF MY JOB BUT I FELT IT WAS A MISSING NECESSARY INGREDIENT TO INSURE THE MOST EFFICIENT SERVICE TO US FOR PLANNING AND ACCOUNTING.

b. MY SUPERIOR HAS STATED BOTH ORALLY AND IN WRITING THAT MY WORK IS OF VERY EXCEPTION/HIGH QUALITY.

c. IN SEP 87, I SUGGESTED TO MR. CARTER A SYSTEM TO IMPROVE THE SPACE DATA PROCESS FROM REQUESTING AGENCY, THROUGH RPA TO SUD. I SUBMITTED A ROUGH DRAFT FLOW CHART TO SHOW THE SUGGESTED REORGANIZATION AND FLOW PROCESS. I NOTICED THAT THIS HAS BEEN PROFESSIONALLY DRAFTED AND WILL BE PRESENTED TO THE RPA ASSOC DIRECTOR, HOWEVER, MR. CARTER NEVER MENTIONED THIS TO ME.

D. KINDLY ADVISE ME IN WRITING OF YOUR DECISION IN THE MATTER. I AM REALLY SORRY THAT MY GRIEVANCES HAVE TO BE AIRED TO YOU BUT I HAVE SPENT THE PAST FEW MONTHS ATTEMPTING TO RESOLVE THEM WITHIN THE DIVISION TO NO AVAIL.

ATTACHMENTS:
1. MEMORANDUM OF HARRASSMENT IN THE OFFICE
 TO MR. CARTER FROM P. KIDD
2. LETTER TO MR. CARTER RE: USE OF MS.
 HENDERSON DATED 5-18-88
3. MEMO FOR THE RECORD
4. DOCUMENTED PAPER-TRAIL
5. LETTER OF DIRECTION
 TO PATRICIA A. KIDD FROM MR. CARTER
6. MEMORANDUM OF DELEGATION OF AUTHORITY
 TO ALL SUD STAFF FROM MR. CARTER
8. REBUTTAL LETTER
 TO MR. CARTER FROM MS. KIDD

CC: MR. FORD
 EMPLOYEE RELATIONS SPECIALIST
 PERSONNEL OFC #2
 REEVES CENTER

TO : MR. KING, ADMINISTRATOR 9 JUNE 88
 REAL PROPERTY ADMINISTRATION

FROM : PAT KIDD, PROPERTY UTILIZATION
 SPECIALIST, SUD, RPA

SUBJECT : AMENDMENT TO GRIEVANCE

YOU ARE HEREBY NOTIFIED THAT I AM AMENDING MY GRIEVANCE. THIS ACTION IS BEING TAKEN FOR THE FOLLOWING REASONS:

1. SINCE NOTIFYING MY SUPERVISOR THAT I WAS FILING A FORMAL GRIEVANCE (18 MAY 88), I HAVE BEEN EXCLUDED FROM FURTHER INVOLVEMENT IN SPACE MATTERS INCLUDING THE MAYOR'S SPACE PLAN PRESENTATION. PRIOR TO THE FILING, I WAS DESIGNATED AS AN ACTIVE PARTICIPANT NOT ONLY FROM THE COMPUTER ASPECT BUT TO BE INVOLVED IN MEETINGS (INTEROFFICE, RPA ADMINISTRATOR'S LEVEL, AND DAS DIRECTOR), ASKED TO REVIEW AND WRITE DRAFT POLICIES, MAKE SUGGESTIONS AND RECOMMENDATIONS ETC. AS OF 18 MAY 88 TO THE PRESENT, THIS IS NO LONGER THE CASE AND TODAY, 8 JUN 88. IN THE RPA STAFF MEETING IT WAS ANNOUNCED THAT THE MAYOR SPACE PRESENTATION WILL BE PRESENTED TO THE SENIOR STAFF FRIDAY (THIS WAS THE FIRST I HAVE HEARD OF THIS).

2. (ALSO I HAVE BEEN DENIED THE OPPORTUNITY TO SERVE AS ONE OF RPA'S REPRESENTATIVES FOR THE DAS' WOMEN'S ADVISORY COMMITTEE. THIS IS WHAT I CONSIDER AN EVENT OF INTEREST WHICH I FEEL WILL BE OF BENEFIT IN ALLOWING ME AN OPPORTUNITY TO INTERFACE WITH OTHER WOMEN THROUGHOUT DAS. NO REASON IS GIVEN BY MY SUPERVISOR.

3. FROM 18 MAY 88, MY SUPERVISOR DID NOT SPEAK TO ME OR MAKE CONTACT REGARDING ASSIGNMENTS OF ANY KIND UNTIL I APPROACHED HIM REGARDING REPORTS 2 JUNE 88.

I BELIEVE THESE INCIDENTS TO BE REPRISALS/RETALIATIONS AND WISH TO AMEND MY GRIEVANCE TO INCLUDE THEM. RESPECTFULLY REQUEST A MEETING OR YOUR IMMEDIATE ATTENTION TO MY GRIEVANCE.